Kenneth **REINER** and Frank A. Klaus, Jr., d/b/a Kaynar Company and Kaynar Mfg. Co., Inc., Appellants,

v.

I. LEON CO., Inc., Appellee.

No. 77, Docket 25662.

United States Court of Appeals
Second Circuit.

Argued Nov. 4, 1960.

Decided Dec. 21, 1960.

Swan, Circuit Judge, dissented in part.

Walter P. Huntley, Los Angeles, Cal., William R. Liberman, New York City, Fulwider, Mattingly & Huntley, Los Angeles, Cal., of counsel, for appellants.

Henry L. Burkitt, New York City, for appellee.

Before HAND, SWAN and MEDINA, Circuit Judges.

HAND, Circuit Judge.

■ This is an appeal from a judgment of Judge Byers, holding invalid for lack of invention claims 1, 2, 3, 4, 7, 10 and 11 of Reissue Patent No. 23,163. We are told that only claims 2 and 3 are in suit. The invention is for "clamps," used to maintain "formed curls" in a woman's hair, and the first question is whether the disclosure was an "invention." The "clamp" consists of two superimposed members, or "jaws," which open and close at one end under spring pressure, between which, when open, the curl is inserted, and which hold it fast when they are closed. It is difficult to give an adequate understanding of the device without the diagrams that are part of the disclosure, but perhaps the following verbal description may serve. Each member of the "clamp" is struck out of a piece of flat metal, and has two parallel prongs, joined together at one end to form a handle. The metal separating the prongs of the upper member is not cut away at the base where it joins the handle and remains attached as a part of the upper member, forming an intermediate tongue. This tongue is first bent upwards and then downwards between the prongs of the upper member. It has a hook at its end which engages the edge of a slot in the lower member between the two prongs of that member.

The handle end of the upper member is bent upwards at a substantial angle, and the handle end of the lower member is slightly bent up, so that the handle ends of the two members are at a substantial angle to each other. When a user of the "clamp" presses together the handle ends, the prongs are forced apart against the resulting distortion of the tongue of the upper member, and the curl is inserted; and when this pressure is relieved, the prongs close again, grasping the curl.

Were this all, there would be nothing to keep the members from shifting laterally on each other, although they would rock and the prongs would open and close on a fulcrum along the line where the plates are in contact. To remedy this defect the members are held together as follows. Near the handle end of the lower member two "spurs" are struck up out of the metal, and pass into corresponding "sockets" or holes in the upper member, large enough to receive the "spurs" with a loose accommodation. This coaction of sockets and "spurs" makes the two members functionally one, the members being held together by the engagement of the hook at the end of the tongue of the upper member to the lower member. Since the tongue spans the fulcrum of the "clamp," nothing more is necessary; the members will rock upon each other on the line of the "spurs" and sockets as long as the hook at the end of the tongue engages the slot between the prongs of the lower member.

The original application was filed on July 24, 1946 and a patent was issued on January 18, 1949. An application for reissue was filed on July 12, 1949, on which the reissued patent in suit was granted on November 1, 1949. Before the date of the original application a number of patents for hair curlers had issued, and it is against the background of these that we must appraise the invention in suit. The first of them was Goodman's patent, No. 1,893,281, issued on January 3, 1933, one object of which was stated to be "to provide a light, strong and durable spring clip which is constructed without a hinge or pivot pin, and which may be readily manufactured on a high production basis at a relatively low cost" (p. 1, lines 8–12). It disclosed a "clamp," or a "clip," without pivot or hinge. This was followed on February 13, 1934, by a patent to Widerman, No. 1,946,561, which was "hinged." In 1936 a patent was issued to Lindsay, No. 2,031,377, for making a "hair curler," one object of which was making a curl which could be "re-

placed by an article of less size thereby promoting the drying of the hair" (p. 1, lines 25, 26). In 1938 a patent was issued to Jones, No. 2,133,145 (which is incidentally the closest of all the prior art to the patent in suit), and whose purpose was that "the formed curls will be held in curled condition while the hair is moist" (p. 1, lines 4, 5). On February 28, 1939, a patent was issued to Fuscaldo, No. 2,149,214, one object of which was to provide "a new and improved pin or clip that may be removed without becoming entangled in the hair or the net worn by the user" (p. 1, lines 12–15). On July 14, 1942, a patent was issued to Boxer, No. 2,289,749, "for holding relatively flat curled curls or ringlets of hair during drying or 'setting' after which the device is to be removed" (p. 1, lines 2–4). On August 1, 1944, Leon filed an application for a design patent for a curl clip.

Thus, between the appearance of Goodman and application for the original patent in suit an interval had elapsed of thirteen years, the art had disclosed seven "clamps" for hair curlers; and the answer to the need for such a device had obviously been the subject of much experiment. How far any of these succeeded the record does not show; but it is apparent that the patent in suit has been widely accepted. Reiner, one of the inventors, had been in a war industry, and had had no experience in women's dress or adornment. Braga, his associate, was, so far as appears, equally unfamiliar with the subject matter. The record does not specifically show what attracted them to this kind of device; but it at once achieved an unexpected success. In the first year—1946—its sales approximated $40,000, which at ten cents for every three clamps meant a sale of over a million clamps, and in twelve years the sales had reached 90 million. In 1957 they were about 750,000 a day, and by 1958 the plaintiff had established an almost complete monopoly of the "two-piece clips in the market." These figures apparently the defendant does not challenge.

We are of course acutely aware of the constant reminders in the books

that the sale of a patented device is not alone a measure of its invention, and we accept that conclusion. Nevertheless, great commercial success, when properly scrutinized, may be a telling circumstance. It is idle to say that combinations of old elements cannot be inventions; substantially every invention is for such a "combination": that is to say, it consists of former elements in a new assemblage. All the constituents may be old, if their new concourse would not "have been obvious at the time the invention was made to a person having ordinary skill in the art" (§ 103, Title 35). That has been the statutory definition since January 1, 1953. We discussed the question at length in Lyon v. Bausch & Lomb Optical Co., 2 Cir., 224 F.2d 530, and have little to add to what we then said. There can be no doubt that the Act of 1952 meant to change the slow but steady drift of judicial decision that had been hostile to patents which made it possible for Mr. Justice Jackson in dissent to speak of the "strong passion in this Court for striking them" (patents) "down so that the only patent that is valid is one which this Court has not been able to get its hands on." Jungerson v. Ostby & Barton Co., 335 U.S. 560, 572, 69 S.Ct. 269, 274, 93 L.Ed. 235. That was in 1945, while the test laid down in Hotchkiss v. Greenwood, 11 How. 248, 266, 13 L.Ed. 683 still had a nominal authority, of which little remained in actual application. We still cannot escape the conclusion—as we could not when Lyon v. Bausch & Lomb Optical Co., supra, was decided in 1955—that Congress deliberately meant to restore the old definition, and to raise it from a judicial gloss to a statutory command. It is not for us to decide what "discoveries" shall "promote the progress of science and the useful arts" sufficiently to grant any "exclusive right" of inventors (U. S. Constitution, Article 1, § 8). Nor may we approach the interpretation of § 103 of the Title 35 with a predetermined bias.

The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person

"having ordinary skill" in an "art" with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not, "obvious" is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it. There are indeed some sign posts: e. g. how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant? In the case at bar the answers to these questions all favor the conclusion that it demanded more intuition than was possessed by the "ordinary" workers in the field. The needs were known, but the purpose to fulfil them with that minimum of material and labor disclosed in the patent had not appeared; and economy of production is as valid a basis for invention as foresight in the disclosure of new means. In the case at bar the saving of material as compared to anything that had preceded, was very great indeed; the existing devices at once yielded to Reiner's disclosure; his was an answer to the "long-felt want."

Jones's patent, 2,133,145, is the nearest of all those offered, but the lower member, 11, is kept in register with the upper member, 10, by means of the "side flanges, 17," which requires the upper member to be different from the lower, and the use of more metal than the spur and socket device of the patent in suit. Moreover, the closing spring is altogether different. In such small and fragile devices slight divergences may be determinative. The "clamps" are small and easily lost; they must not be too troublesome to adjust, yet tenacious when in place. They are used in substantial quantity and cheap enough to make trivial their detachment and loss, which will be frequent. Nevertheless they are obviously an important accoutrement of a woman's wardrobe, as appears not only from the amazing quantities sold, but from the repeated variants that kept coming upon the market. Unless we are to measure invention by the size and complexity of the product, this new article fulfilled the qualifications for a patent. We hold Claim three valid.

The other defenses do not require any extended discussion. It is plain that the reissued Claim three did not enlarge the scope of the invention. It is also plain that its language reads, not only on the specifications, but upon the defendant's "clamp." The distinction suggested that the "resilient integral extension," i. e. the spring, pulls instead of pushes, the members together as in the defendant's "clamp" is irrelevant. Claim three does not contain as an element either method, and covers both. If there is a patentable distinction between the two, it might confine the patentees to the disclosure of their patent; but that would not invalidate Claim three. A claim must of course read upon the specifications, but the specifications, unless so declared, are only an example of what the claim is intended to cover; it is a species of a broader genus, else no claims would cover anything not literally described in the specifications. There is nothing in Grubman Engineering & Manufacturing Co. v. Goldberger, 2 Cir., 47 F.2d 151 to the contrary.

The judgment dismissing the complaint is reversed; judgment for the plaintiff will be entered on Claim three of the patent, and the complaint will be dismissed as to the other claims as moot.

SWAN, Circuit Judge (dissenting in part).

In my opinion Judge Byers' decision holding invalid claim 3 should be affirmed. I agree to dismissal of the complaint as to the other claims as moot.