293 F.2d 127
 HONOLULU OIL CORPORATION, and Barker Poultry Equipment Company, Appellants,
v.
SHELBY POULTRY COMPANY, a partnership consisting of William L. Shaw and L. E. Needham, and
The Pickwick Company, Intervenor, Appellees.
 No. 8237.
 United States Court of Appeals Fourth Circuit.
 Argued January 20, 1961.
 Decided July 24, 1961.
 
 Robert F. Conrad, Washington, D. C. (Raymond P. de Member, Watson, Cole, Grindle & Watson, Washington, D. C., Thomas B. Gay, and Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., on brief), for appellants.
 Frank W. Snepp, Jr., Charlotte, N. C. (Edward A. Haight, Haight, Lockwood & Simmons, Chicago, Ill., and McDougle, Ervin, Horack & Snepp, Charlotte, N. C., on brief), for appellees.
 Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.
 HAYNSWORTH, Circuit Judge.
 
 
 1
 We are concerned with chicken feathers and their removal during the processing of poultry for marketing. Patents covering an apparatus and a method for removal of the feathers were held by the District Court to be invalid for obviousness in the light of paper patents in other fields.[1] We think the credit the District Court gave the work of the patentee was less than its due.
 
 Background
 
 2
 Hunt patent No. 2,300,157 issued in 1942 upon an application filed November 16, 1939, covering the first practical apparatus for plucking poultry feathers. It consisted of a rotatable drum in which rows of protruding, flexible fingers were mounted. On most of the exposed portion of these fingers, usually made of rubber, are a series of projections or corrugations having an appearance similar to screw threads, and there is a terminal flange of larger dimension than the other projections. When the device is rotated so that the protruding fingers will strike the scalded carcass of a bird, the terminal flange and the thread-like projections frictionally engage and remove the feathers across which the flexible fingers are drawn by rotation of the drum in which they are mounted.
 
 
 3
 In its simplest form, the Hunt machine is operated without other apparatus. An operator must hold in his hands a scalded bird so that it may be struck by the fingers of the rotating drum. The operator must turn each bird over and around so that each portion of the bird is presented to the defeathering fingers. Nevertheless, use of the Hunt device in this manner was much easier and faster than hand plucking.
 
 
 4
 Validity of the Hunt patent was upheld in Hunt v. Armour & Co., 7 Cir., 185 F.2d 722.
 
 
 5
 The Hunt device was also used in a so-called automatic form. A pair of them were so placed that the defeathering fingers of each drum would strike opposite sides of a bird drawn between them. Birds were suspended by their feet from shackles attached to a conveyor which drew them between the pair of defeathering devices.
 
 The Claimed Invention
 
 6
 The Hunt devices had been in wide use for a number of years when, in 1951, A. J. Toti conceived the idea of encasing a rotating drum with Hunt's defeathering fingers in an outer, rotatable shell. When scalded carcasses of birds are placed in the Toti machine, the outer shell keeps the birds in position to be struck by the fingers, partially retards the motion imparted to the birds by the force of the fingers and causes the birds to be tumbled about so that all of their parts are presented to the fingers and are defeathered. Birds thrown loosely into the machine at the top may be automatically discharged, defeathered, at the bottom.
 
 
 7
 On September 7, 1951, Toti filed a patent application containing both apparatus and method claims. The Patent Office required a division of the method and apparatus claims. Thereafter two patents issued, one No. 2,754,539 on July 17, 1956 containing method claims and the other No. 2,805,443, on September 10, 1957, containing apparatus claims. For our purposes, claim No. 1 of the No. 2,805,443 patent is sufficiently descriptive of the claimed invention.[2]
 
 
 8
 Toti assigned the patents to the plaintiff, Honolulu Oil Corporation, which licensed the plaintiff, Barker Poultry Equipment Co., to manufacture and sell the patented machine.
 
 
 9
 Barker's commercial machine known as the Barker Cyclomatic Picker,[3] clearly embodies the principles of the Toti patent. Before it was placed in production, the machine was re-engineered by Barker, for Toti lacked facilities for such purposes and there are superficial differences in the appearance of the commercial machine and the relatively crude machine represented by the patent drawings. Such differences are to be expected when the inventor has no engineering staff, and it does not follow that the excellence of the performance of the commercial machine and its commercial success are attributable solely to Barker's good engineering. The machines are a commercial embodiment of the invention and covered by claims of the patent. Since the patent discloses all of the essential functions of the commercial machine, it is not necessary that it also disclose all of the refinements of the production model.[4]
 
 
 10
 The defendant goes to considerable effort to disparage the Toti machine to deny to it the advantage of the success and performance of Barker's commercial models. This it undertakes to do on the basis of a demonstration of a machine made in exact conformity with drawings of the Toti patent. Three scalded chickens were placed in the machine; the machine was operated for forty-five seconds while the District Judge and counsel observed its operation, after which the three defeathered chickens were removed.[5] The defendants then argue that if it took forty-five seconds to process three chickens, the production capacity of this machine would be no more than two hundred an hour, a rate Hunt claimed in his patent for his machine.
 
 
 11
 There is nothing to support such a contention. The testimony shows that three chickens were used for the demonstration of each machine in order that the court and the other observers might better see how each operated. There is no evidence that the capacity of the machine was only three birds. There is affirmative evidence that the commercial model of Pickwick's machine had a much larger capacity, but it, too, took forty-five seconds to defeather the three birds placed in it. The demonstration furnished no basis for the computation of production rates.
 
 
 12
 The defendants concede that production models of the patented machine can defeather 1250 to 1500 birds an hour. There is testimony that the fully automatic machine can process 4,500 pounds of poultry an hour. There is no evidence that such high production rates are attributable to anything other than a workman-like application of the disclosures of the patent. The fact that the disclosures of the patent are practiced efficiently does not degrade the disclosures.
 
 
 13
 Barker had sold 616 machines under its license for $1,688,063 and had paid to Honolulu Oil royalties of $168,806. These machines have an aggregate rated capacity of 2,470,500 pounds of poultry an hour.
 
 
 14
 In addition to their advanced rate of production, there is testimony that the operation, maintenance and repair of the patented machines are easier and less costly than of the earlier Hunt machines.
 
 
 15
 The District Court did not question the fact that the Toti disclosures were a substantial contribution to the poultry processing industry. He found the patents invalid solely on the ground of obviousness in the light of earlier patents in other fields. The patents which led the District Judge to this conclusion were Kohlhepp Patent No. 1,002,920 for an apparatus for dehairing and polishing the carcasses of hogs, Vucassovich Patent No. 2,355,405 on an apparatus for removing the scales of fish, and Kohl Patent No. 2,131,377 for a grating machine to remove in comminuted form the rind of aciduous fruits.
 
 Kohlhepp Patent No. 1,002,920
 
 16
 The Kohlhepp Patent No. 1,002,920 discloses a large cylindrical drum with a long foot extension reaching to the bottom of a scalding pit beneath the drum. When the drum was rotated, the foot extension would scoop up the carcass of a hog from the scalding pit, and, as the foot was rotated into an elevated position, the carcass would slide into the drum. There were internal ridges inside the drum designed to lift the carcass up with the drum's rotation and to roll the carcass over to expose it to the blows of rotating arms centrally mounted in the drum, to which were attached metal scrapers designed to remove the bristles and polish the carcass.
 
 Vucassovich Patent No. 2,355,405
 
 17
 The Vucassovich Patent No. 2,355,405 also discloses a rotating drum disposed in a generally horizontal manner. Fish placed within the drum were carried by the drum's rotation to an elevated position above another rotating cylinder within the drum having on its surface small blades designed to remove scales from the fish, which, from an elevated position, fell to come into contact with and pass the rotating inner cylinder, and would fall to their starting position in the drum. The rotating drum would again elevate the fish to a position from which they would again fall onto and past, the rotating, descaling cylinder.
 
 Kohl Patent No. 2,131,377
 
 18
 Kohl Patent No. 2,131,377 covers a machine intended for use in bakeries and confectioneries requiring grated fruit rind for flavoring. Essentially, it consists of a perforated bowl and a rotatable cylinder vertically mounted in the middle. Lemons and oranges placed in the bowl are brought by gravity into contact with the rotating surface of the cylinder. Protuberances on the surface of the cylinder tear bits of the rind from the fruit, and the interaction of the motion of the cylinder and the sloping side of the bowl causes the fruit to move about the bowl and to expose all of its surface to the action of the grating element.
 
 
 19
 ......................................
 
 
 20
 There is no evidence that any of these machines, designed to remove the bristles of hogs, the scales of fish and the rinds of lemons and oranges, were ever built or successfully operated. So far as it appears on this record, these are only paper patents. They do show arrangements of drums and bowls designed to bring objects placed within them into contact with rotating elements within the drum or bowl for the purpose of removal of something from the object placed in it. Functionally, the drums of Kohlhepp and Vucassovich are different from the outer shell of the Toti machine. The drums of Kohlhepp and Vucassovich were designed to impart motion to the hogs and fish, respectively, and to roll the hogs over and to drop the fish upon the descaling element. Toti's cylinder, however, was designed to retard and restrain the movement of the birds imparted by the motion of the defeathering fingers. The Kohlhepp and Vucassovich machines would be inoperable if the drums were stationary; Toti's machine is not.
 
 
 21
 No one suggests that the machines of either of these three earlier patents could successfully defeather chickens. At most, they disclose a housing designed to bring or keep objects placed within them in contact with rotating means designed to operate upon the surface of the objects to be processed. The District Court thought it was an obvious advance to thus enclose the Hunt mechanism with its defeathering fingers.
 
 
 22
 That this advance was not obvious to people in the poultry industry, however, is clearly demonstrated in the record. Each bird has many thousands of feathers. They vary from the fluffy and lightly imbedded body feathers to the tough and deeply imbedded wing and tail feathers. The body is not a simple shape and the feathers must be removed from the insides of the long legs and from the body between them, as well as beneath the wings. Furthermore, the birds to be marketable must be without broken bones, breaks in the skin, or ugly bruises. For many years, those using the Hunt machine had used human hands, or conveyors, to make certain that each portion of the body of the bird was presented to the defeathering fingers. Until Toti did it, apparently no one thought that this purpose could be accomplished by enclosing the Hunt machine in an outer shell.
 
 
 23
 This was not a stagnant field in which no one was attempting to advance the art. The record contains evidence of other patents showing efforts to develop machines and methods which would give improved results over the Hunt machine. The machines of these patents were, generally, inoperable. Mr. Corey, the President of the defendant Pickwick, an inventor and patent attorney, was part owner of one of these patents, Drews No. 2,444,556, issued July 6, 1948 upon an application filed August 2, 1943, and, as attorney, represented the patentee in processing the application. Mr. Corey testified in this case that no such machine was ever sold, but that, with one simple change, the Drews machine could have been converted into a loose fowl processing machine. No such change was made until 1955, however, obviously for the reason that Mr. Corey did not think a loose fowl processing machine was practicable. That such machines were thought impractical is further indicated by the fact that the examiner in the patent office first rejected all of the Toti claims on the ground of inoperativeness, while the defendant in this action interposed the defense that Toti's patented device was inoperable. Mr. Corey, Pickwick's President, in answer to an interrogatory stated that his experience in the manufacture of poultry pickers led him to the belief that the machine disclosed in the drawings of the Toti patent would break the legs and wings of birds being processed in it, would not pick the birds evenly and could not produce a commercially acceptable product. The demonstration of the Toti machine at the trial and the great success of its commercial embodiment proved Mr. Corey wrong, but when experts working in the field in search of improved results were of the opinion that a thing could not be done, it is not for the court to say that because of paper patents in some other field, it would have been obvious to any expert that the impossible was easily accomplished. What Toti did may now seem simple, but we cannot say it was obvious when, though it represented a substantial advance, it eluded experts who were searching for it over a considerable period of time. As this Court recently said:[6]
 
 
 24
 "* * * Obviousness does not mean that one skilled in the art can perceive the solution after it has been found and pointed out by someone else; the test of obviousness is as of an earlier time, when the search is on. * * *"
 
 
 25
 The defense of obviousness is founded upon the statute,[7] which provides that a patent may not be obtained if, in the light of the prior art, the subject matter as a whole would have been obvious to a person having ordinary skill in the art. The Courts must provide an answer to that question, but they should not do so on the basis of subjective speculation as to what, after everything has been disclosed to it, might have seemed obvious to it. At least, when the record furnishes a basis for resort to objective standards, they should govern the court's determination.[8]
 
 
 26
 Here, there are present all of the indicia of invention. Toti's machine and his method greatly simplified the plucking operation and enlarged its productivity. They provided a means of reducing operating costs and reduced, or simplified, maintenance and repairs. They were promptly accepted by the industry as an answer to a recognized need, achieving very substantial commercial success. The need had been felt for many years and experts of more than ordinary skill had been engaged in the search for the answer. With all of these objective indications that Toti's contribution was not obvious, we think the District Court improperly concluded that it was.
 
 
 27
 There are other defenses which we do not reach, for they have not been considered by the District Court. We conclude only that the Toti patents are not invalid because of obviousness. The case will be remanded to the District Court for further proceedings not inconsistent with this opinion.
 
 
 28
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 D.C., 185 F.Supp. 7
 
 
 [2]
 A fowl-picking machine for defeathering loose fowl placed therein comprising the combination of three elements namely (1) an assemblage of flexible, frictional fowl-defeathering beaters mounted for rotation about an axis, (2) means operatively connected to said assemblage for rotating it rapidly with its beaters, and (3) means positioned next adjacent to said assemblage extending at least partially substantially circumferentially of said assemblage and formed and positioned with respect thereto to confine loose fowl in at least recurrent defeathering engagement with said beaters when said assemblage is rotating yet permitting the loose fowl to be tumbled about to expose every part of the fowl to the defeathering blows of said beaters
 
 
 [3]
 The machine is offered in different sizes. One model is loaded and unloaded automatically; others must be loaded by hand
 
 
 [4]
 Kromer v. Riegel Textile Corporation, 7 Cir., 227 F.2d 741; Holliday v. Long Manufacturing Company, Inc., D.C.E.D. N.C., 146 F.Supp. 527, reversed on other grounds, Long Manufacturing Company, Inc. v. Holliday, 4 Cir., 246 F.2d 95
 
 
 [5]
 In his opinion the District Judge said the three chickens were fairly well defeathered, but were not finished products. During the trial, however, he commented that all three of the machines demonstrated, including one of the production models of the defendant, Pickwick, worked perfectly. In any event, Pickwick here does not question the quality of the product of the machine constructed in accordance with the patent drawings. It seeks to minimize the machine only on the basis of its rate of production
 
 
 [6]
 S. H. Kress & Company v. Aghnides, 4 Cir., 246 F.2d 718, 723. See, also, Diamond Rubber Company of New York v. Consolidated Rubber Tire Company, 220 U.S. 428, 435, 31 S.Ct. 444, 55 L.Ed. 527; Manville Boiler Company v. Columbia Boiler Company of Pottstown, 4 Cir., 269 F.2d 600
 
 
 [7]
 35 U.S.C.A. § 103
 
 
 [8]
 Reiner v. I. Leon Co., Inc., 2 Cir., 285 F.2d 501; Norman v. Lawrence, 2 Cir., 285 F. 2d 505