323 F.2d 29
 139 U.S.P.Q. 20
 Charles J. ALLEN, Jr., and American Crankshaft company,
Appellants and Cross-Appellees,
v.
STANDARD CRANKSHAFT & HYDRAULIC COMPANY, Inc., Parts
Warehouse, Inc. (nowStandard Crankshaft company,
Inc.), and Homer H. Brackett, Appellees
andCross-Appellants.
 No. 8935.
 United States Court of appeals Fourth Circuit.
 Argued June 4, 1963.
Decided Sept. 23, 1963.
 
 Channing L. Richards, Charlotte, N.C., for appellants and cross-appellees.
 Joseph Y. Houghton, Washington, D.C. (Paul L. Muilenburg and William J. Waggoner, Charlotte, N.C., on brief) for appellees and cross-appellants.
 Before HAYNSWORTH and J. SPENCER BELL, Circuit Judges, and BARKSDALE, District Judge.
 HAYNSWORTH, Circuit Judge.
 
 
 1
 The District Court held invalid, on several counts, and uninfringed plaintiffs' patent No. 2,567,685 on a 'method of Reconditioning Crankshafts and the Like,' but it found that a service mark used by the defendants was confusingly similar to a mark previously used by the plaintiffs, and concluded that continued use by the defendants of their mark should be enjoined. We agree with the District Court on both branches of the case.
 
 
 2
 An automotive crankshaft is a complicated structure. In its axis there are several main journals, designed for installation in the main bearings of an engine block. In a balanced pattern, there are radially projecting web parts supporting orbital rod throw journals, designed to receive the bearing end of the connecting rods, and, through them, to convert the power of the up and down motion of the pistons into a rotation of the crankshaft. The rearmost main journal has outwardly extending flanges on either side which limit forward or rearward motion of that journal and thus of the crankshaft when the rearmost bearing has been fitted. The inner faces of these outwardly extending flanges are known as thrust bearing surfaces. At the rear end of the crankshaft is a flange to which the flywheel is attached when installed. At the front end of the crankshaft is a neck, designed to receive and support the timing mechanism and, forwardly of that, a pulley or pulleys for belt drives.
 
 
 3
 Operated over a long period of time, the main and the rod throw journals wear. Additionally, the forward pressure from the clutch causes wear of the rear thrust bearing surface. In normal operation, the forward thrust bearing surface is not subjected to appreciable wear. When the wear of the journals and the rear thrust bearing surface becomes excessive, the engince begins to knock and lose efficiency. In time, the worn crankshaft must be replaced with a new or reconditioned one.
 
 
 4
 For many years, worn crankshafts had been reconditioned by turning down the worn journals to a smaller dimension for use in association with undersized bearings. This procedure cannot be repeated many times, however, and, during World War II, when a scarcity of new crankshaft replacements developed, the plaintiffs, operating a shop in Charlotte, North Carolina, felt a need to resort to some other method of reconditioning by which the journals would be rebuilt and reconditioned to standard size. They first tried 'metalizing' the worn journals, a process by which liquid metal is sprayed upon the worn journals. Metalizing, however, effects only a mechanical bond between the original steel and the new material. In operation, it was found that the mechanical bond would frequently fail and the new material would break up. The plaintiffs then turned to arcwelding as a means of building up worn journals to be refinished to standard size.
 
 
 5
 Though arcwelding is a well known process for the building up of worn or damaged machine parts to be refinished to original size, the plaintiffs experienced a number of difficulties in adapting welding to their operations. At first, their equipment had insufficient amperage, and when proper equipment was obtained and the employees had developed the necessary welding skills, it was found that the welding build-up of the throw rod journals introduced distortion into the crankshaft. As the welded material is fused with the original metal under very intense heat, stresses are introduced which tend to draw together the web cheek faces adjacent to the rod throws, drawing apart the associated counterweights on the other side of the axis of the crankshaft. These stresses are relaxed to some extent when the new metal on the rod throws is ground off to restore the journal to its original diameter, but the stresses introduced by the welding process are not completely eliminated in the finishing.
 
 
 6
 To overcome this distortion, resort was has to heat treatment and mechanical processes to straighten and realign the crankshaft. Nevertheless, the overall effect fect of reconditioning crankshafts by building up the worn journals with welds and then turning them down to their original diameters was to shorten the crankshaft. This led to a number of complaints that a reconditioned crankshaft would not fit into the engine block, and that rod throw were out of alignment with piston-centered connecting rods. Nevertheless, in 1946, 1947 and 1948, the plaintiffs reconditioned and sold many thousands of crankshafts having journals of standard diameters obtained by arcwelding and refinishing processes.
 
 
 7
 Sometime in 1947, a reconditioned Model A Ford crankshaft was returned to the plaintiffs with the complaint that it would not fit in the block. It was said, 'the front main bearing was back so far the timing gear wouldn't go on.' By comparison with an unreconditioned Model A Ford crankshaft, it was found that the reconditioned shaft was between one-eighth to one-quarter of an inch shorter than the unreconditioned shaft. A gauge was then made by which the distance between the rear thrust bearing surface and the neck of the shaft could be measured and fixed. The front main bearing of the defective shaft was then built up, as was its neck, and these were reground until the proper dimension between the rear thrust bearing surface and the end of the neck was established.
 
 
 8
 All of these events occurred more than a year before the application for the patent in suit, which was filed on May 7, 1949. Everything done during that period was old in the art and well known, and if there were any novel combination or process, it came into the public domain when the plaintiffs failed to apply for a patent within twelve months after their open, commercial practice of it. It is said, however, that in the summer of 1948, it suddenly occurred to Mr. Allen that by repositioning the thrust bearing surfaces he could compensate for the foreshortening of the shaft and restore all proper dimensional relations between the journals. There then were constructed gauges with feeler arms by which the dimensional relation between the rear thrust bearing surface, the neck of the shaft and one side of each rod throw and main journal could be determined and checked. Mr. Allen testified that the essence of his claimed invention was that location of the rod throws, and, more particularly, of the rear main bearing and the thrust bearing surfaces, should be obscured in the welding and then relocated in the grinding according to the gauge, so that the machine finished surfaces would be in the same dimensional relation as in a new crankshaft.
 
 
 9
 From a number of exhibits introduced in evidence, it appears that the general practice of the plaintiffs is to rebuild a rear main bearing and the unworn forward thrust bearing surface, but not the worn rear thrust bearing surface. In the finishing, the worn rear thrust bearing surface is finish ground and the new forward thrust bearing surface is then located the proper linear distance from the rear. The result is a rearward relocation of the rear main bearing by approximately 20/1000ths of an inch, normal wear of the rear bearing surface being approximately equal to the residual distortion from the welding which remains after the straightening and finishing processes. The testimony indicates, however, that the plaintiffs with their gauges, undertake to precisely locate all new finished surfaces in proper lineal relation, and the shop practice, as disclosed by the exhibits may be the result of the teaching of experience that the new rear thrust bearing surface must be at least as far to the rear as the old, worn, rear thrust bearing surface.
 
 Claim 3 of the patent is typical:
 
 10
 '3. The process of reconditioning worn automotive crankshafts and the like which comprises fusing a surface coating of metal on the main journals and rod throws, and on the thrust bearing surfaces, of a worn crankshaft by electric welding, wherein the heat of fusion causes stresses that result in distortion of the crankshaft, rough grinding said rod throws oversize and in proper lineal relation to each other and to the required lengthwise dimension from the neck of said crankshaft, and thereby substantially relieving the stresses resulting from the application of said fused metal coating, and finishing said rod throws and then said main journals and said thrust bearing surfaces all in relation to the proper lineal relation established for said rod throws.'
 
 
 11
 The defendant, brackett, was the plaintiff's shop foreman until late in 1948 when he left to establish a competing business for himself Charlotte. He began to recondition automotive crankshafts for himself, and, because he could do it at a lower price, he took most of the plaintiffs' business, with the result that the plaintiffs turned to work upon crankshafts for industrial and other engines requiring more precision than automotive crankshafts. The defendants say that they simply regrind the built-up journals where they lie. It is plain, however, that they position the main bearing where it lies in its worn state, not in its original position, for they build up the forward thrust bearing surface with weld material, and, in the finishing, smooth grind the rear thrust bearing surface and locate the new front bearing surface from there. The result is to reposition the rear main bearing and the thrust bearing surfaces by the amount of normal wear upon the rear thrust bearing surface. The defendants say they make no other measurements and use no gauges to establish ro check lineal relationships.
 
 
 12
 At the outset, it is conceded that everything in the patent claim is old and, in combination, without novelty down to the last clause which requires that the grinding of the rod throws, main journals and thrust bearing surfaces all be in relation to the proper lineal relation established for the rod throws. That, of course, is what everyone had been attempting to do all the while, and the District Court was of the opinion that if the claim is read to mean that the thrust bearing surfaces should be relocated rearwardly, the invention is not sufficiently disclosed by the patent. Much is to be said for that view, though the plaintiffs contend, not without some reason, that, in the welding, distortion is unpredictable and that the claim's requirement that the rear main journal and the thrust bearing surfaces shall be relocated in lineal relation to the rod throws simply makes the claim apply as a proper corrective of whatever distortion has been introduced by the earlier processes. At any rate, we need not hold the patent invalid because of insufficiency of its disclosure, for we agree with the District Judge that the patent is invalid because of obviousness.
 
 
 13
 As we have noted, the plaintiffs had been receiving complaints that some of their reconditioned shafts could not be made to fit into the engine block. The one shaft returned in 1947 was measurably foreshortened, and the complaint was, 'the front main bearing was back so far the timing gear wouldn't go on.' On that crankshaft the main journal and the thrust bearing surfaces had been finished, and it may have been the natural thing to attempt to correct that one by building up the front main bearing and the neck of the shaft, but, with the gauges which were then prepared and were used thereafter, the difficulty could be avoided originally by repositioning the thrust bearing surfaces. Since the endeavor then clearly was to establish the proper lineal relation between the neck of the shaft and the rear thrust bearing surface, any gauge applied to a foreshortened shaft would disclose that the original lineal relation could be re-established, either by building up the neck or, at the other end of the same gauge, relocating the thrust bearing surface rearwardly from its original position. Indeed, there is no evidence that the plaintiffs ever attempted to compensate for the welding distortion by building up the neck and front main bearing, except upon the one Model A Ford crankshaft returned to it. When the gauge was applied to any work in process, it would have been obvious that the rear thrust surface should be located at or close to the location of the worn surface, and that building up the unworn surface, rather than the worn, would have at once approximated the desired lineal relationship between the thrust surfaces and the neck of the shaft, and, at the same time, would reposition the crankshaft forward, so that the front main journal would be properly located. This would occasion no more work than a build up of the worn thrust bearing surface and much less than an attempt to compensate for distortion by extensions of the neck and of the front main bearing.
 
 
 14
 Any good mechanic who receives complaints that his product is faulty in the lineal relation of its parts would undertake to measure them, and, if practical, devise a gauge by which he could check his work just as the plaintiffs did immediately upon the return of the faulty crankshaft in 1947. Once the plaintiffs recognized the need for precisely re-establishing the lineal relationship between the neck of the shaft and the rear thrust bearing, as they plainly did in 1947, the means of achieving it in regrinding the main journal and the thrust bearing surfaces was obvious, for at the rear of the shaft there was space available and no need whatever for relocating the main journal or thrust bearing surfaces by reference to the original location of the front thrust bearing surface.
 
 
 15
 The plaintiff, Allen, testified that it did not occur to him until sometime in the summer of 1948 that the thrust bearing surfaces should be relocated rearwardly. He leaves wholly unexplained what he did with the gauges he prepared in 1947 for the purpose of measuring the proper lineal relation between the thrust bearing surfaces and the neck of the shaft. Nor does he suggest that the answer, which he admits came to him in 1948, was obscured by any difficulty or want of information in 1947.
 
 
 16
 It is true that the testimony indicates more refined gauges were constructed in 1948 having feeler arms to locate the edge of the rod throws as well as intermediate and front main bearings. They, however, were simply a refinement of the means by which the principle of re-establishing proper lineal relations between the parts could be practiced. They were not the first means by which the plaintiffs could measure and re-establish a proper lineal relation between the thrust bearing surfaces and the neck of the shaft. They did not come into existence upon recognition of the need to have the thrust bearings and the neck of the shaft in proper lineal relation, for that had been well recognized in 1947. The simpler gauges constructed in 1947 had been used to establish and determine that relation. In short, it abundantly appears that the plaintiffs knew in 1947 that they could establish the desired lineal relation when the main bearing and its thrust bearing surfaces were reground, or that it was perfectly obvious that they could do so once they recognized the need for it and provided themselves with a gauge by means of which the grinder could determine the location of his cuts. The plaintiff, Allen, invented nothing, he solved a shop problem which arose out of complaints which he had received.
 
 
 17
 Under the statute,[1] a patent may not be obtained if, in light of the prior art, the subject matter as a whole would have been obvious to a person having ordinary skill in the art, If there is such obviousness, an issued patent is invalid, and it is the Court's duty to hold it so.
 
 
 18
 In approaching the question of obviousness, however, judges should mistrust their subjective notions if there are objective indicia to guide their judgments. Though the answer after the event may appear simple, the Court should not convert its simplicity into obviousness in the face of hard proof of recognized need for the answer, of long, unsuccessful search for the answer by people of skill in the art, of recognition by the industry that the claimed invention was the answer, and of its prompt adoption with attendant commercial success.[2] Even a substantial combination of some of such criteria ought to outweigh a judge's subjective convictions that if one as skilled as he had really looked for the answer, he immediately could have put his finger upon it.
 
 
 19
 Here, however, there was no showing of an extended, unsuccessful search for means by which the lineal relation of the several parts might be re-established after welding. There was testimony that the plaintiffs received some complaints that some reconditioned crankshafts would not fit into the engine block, but they were selling thousands of such reconditioned crankshafts, most of which were accepted without complaint, and there is no showing that anyone recognized what the problem was or sought to find its answer until late in 1947 when the Model A Ford crankshaft was returned to the plaintiffs and was found to have been demonstrably foreshortened. Then the plaintiffs immediately recognized that they ought to re-establish the lineal relation between the rear thrust bearing surface and the neck of the shaft and devised a gauge to assist them in doing so. Plaintiffs claim a showing of commercial success, but they were commercially successful in reconditioning crankshafts for several years before the date of the claimed invention. Except that the introduction of greater precision into their work would reduce the number of complaints and returns, there is no showing that whatever commercial success has been achieved by the plaintiffs or the defendants is attributable to the invention. Nor is there a showing that anyone else in the industry recognized the claimed invention as the answer to longfelt need, or even that anyone else in the industry sought a license to practice the invention. In short, there are not present here any of those objective indicia of invention to serve as reliable guides to a judgment that the patent is valid. We are left, perforce, to a rather subjective appraisal of what was done, though the absence of objective criteria pointing in the direction of invention may objectively indicate obviousness.
 
 
 20
 When the one crankshaft was returned in 1947, against a background of some earlier complaints that reconditioned crankshafts could not be made to fit, the plaintiffs immediately recognized the need for greater precision in their work. They immediately devised and constructed a gauge with which they could reestablish the lineal relation between the neck of the shaft and the rear thrust bearing surface. That obviously required that the machine operator locate the thrust bearing surfaces with his gauge and not by reference to the original location of the front thrust bearing surface. With the information that the front main bearing was too far to the rear and the knowledge of the overall foreshortening of the reconditioned crankshaft, it was then obvious that the lineal dimension between the thrust bearings and the neck of the shaft could be re-established and the crankshaft correctively repositioned forwardly in the engine block by building up the front thrust bearing and repositioning the rear main bearing in the grinding.
 
 
 21
 What was done in 1948, within the twelve months immediately preceding the filing of the application, was only an extension of insistence upon additional precision to the lineal relations between the thrust bearing surfaces and the main and rod throw journals, as well as to the neck of the shaft. It may be that Mr. Allen only then consciously recognized that he necessarily had to relocate the thrust bearing surfaces, but, if he did not recognize it earlier, it was only because his recognition of the need for greater precision did not spring into full flower when he examined the defective crankshaft late in 1947, but developed during the succeeding months until it was full blown in mid-1948. The means of achieving greater precision did not long remain unseen after he recognized their desirability.
 
 
 22
 The plaintiffs heavily rely upon the presumption of validity. The defendants would weaken that presumption by reference to prior art which was not cited to the Patent Office, while the plaintiffs counter by pointing to prior art which was cited, which they claim altogether comparable to that which was not. The crucial thing, however, appears to be the fact that the Patent Office knew nothing of the state of the art as practiced by the plaintiffs more than twelve months prior to the filing of their application. It granted the patent, not upon the very limited advance which occurred in 1948, but the combination in its entirety, a combination which, in an imprecise way, had been successfully and commercially practiced by the plaintiffs for several years. If the combination of the old means had first occurred in 1948, we would have a different question, but the fact that the Patent Office issued a patent upon the combination does not suggest that it would have thought patentable the means by which greater precision was achieved in its practice. The combination cannot be said to depend entirely upon the introduction of greater precision in its practice, for the plaintiffs, themselves, had successfully practiced the combination without it.
 
 
 23
 Upon the whole case, we think the District Judge entirely warranted in finding the patent invalid for obviousness.
 
 
 24
 When the defendant, Brackett, left the plaintiffs' employ in 1948 and immediately entered into competition with them, he adopted 'ARCWELL' as a mark for his reconditioned crankshafts. He did so well knowing that the plaintiffs used 'ARCPLATED' as a service mark on their reconditioned crankshafts. Subsequently, each mark was registered in the United States Patent Office and no interference proceeding has been had in that office.
 
 
 25
 The letters ARC are so plainly intended to be descriptive of the arcwelding process by which the worn parts are built up to be remachined to standard size that we would hesitate to uphold the District Court's finding of confusing similarity if it were not for the circumstances under which the defendants adopted their mark. They did so intending to apply it to goods indistinguishable in appearance from the plaintiffs, well knowing the plaintiffs' mark and its use, and intending all the while to capture the plaintiffs' customers, which they largely succeeded in doing. Under those circumstances, the mark which they adopted is sufficiently like that of the plaintiffs that they ought not now be heard to say that no great confusion has resulted in fact or is likely.
 
 
 26
 Trade mark infringement does not ordinarily turn upon the morality of the defendant's intentions in adopting his mark. If he adopts the same mark for similar goods in the same market, he infringes whether his intention was reprehensible or whether, because of ignorance of the plaintiffs' mark, he was entirely innocent. When the defendant is fully informed of all the facts at the time he adopts the mark, however, and the question before the Court is the likelihood of confusion of the goods of the competitors in the minds of their purchasers, an apparent motive of the junior party to create confusion and to give to his goods a superficial appearance of being those of the senior party is properly considered in disposing of the question. At least, the junior's insistence that no great confusion has resulted does not require a finding that none was likely when the junior's intention to confuse is apparent.[3]
 
 
 27
 We conclude that the District Court properly enjoined the defendants' use of the mark 'ARCWELL' on their reconditioned crankshafts.
 
 
 28
 Finally, the defendants complain that theirs was the greater part of the victory in the court below, and that the District Court should have awarded them their costs. If the loaf was not evenly divided, however, each side won a substantial victory in the court below and the Court's order that each stand its costs was well within its discretion. Each side has appealed here from so much of the order below as was unfavorable to it, and it appears appropriate to us that each side should pay its own costs in this Court.
 
 
 29
 Affirmed.
 
 
 
 [1]
 35 U.S.C.A. 103
 
 
 [2]
 Honolulu Oil Corporation v. Shelby Poultry Company, 4 Cir., 293 F.2d 127; Reiner v. I. Leon Co., Inc., 2 Cir., 285 F.2d 501; Norman v. Lawrence, 2 Cir., 285 F.2d 505
 
 
 [3]
 Restatement of the Law, Torts, 729; S. C. Johnson & Son, Inc. v. Johnson, 6 Cir., 266 F.2d 129