PAVEMENT SALVAGE CO., Inc.,
Appellant,

v.

ANDERSON'S–BLACK ROCK, INC.,
Appellee.

No. 12020.

United States Court of Appeals
Fourth Circuit.

Argued April 3, 1968.

Decided Nov. 6, 1968.

Certiorari Granted March 24, 1969.
See 89 S.Ct. 1194.

Craven, Circuit Judge, dissented.

Walter J. Blenko, Jr., Pittsburgh, Pa. (Don J. Smith, and Blenko, Leonard & Buell, Pittsburgh, Pa., Edward W. Eardley, and Steptoe & Johnson, Charleston, W.Va., on brief), for appellant.

Alan W. Borst, New York City (Frank L. Taylor, Jr., and Kay, Casto & Chaney, Charleston, W. Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and CRAVEN, Circuit Judges.

HAYNSWORTH, Chief Judge:

The patent owner has appealed from a judgment holding the patent invalid for obviousness. Since we conclude that the patent represents a broader advance than the narrow step which occupied the attention of the District Court, we reverse.

The plaintiff, Pavement Salvage Company, Inc., is the owner of Neville Patent No. 3,055,280 covering "Means for Treating Bituminous Pavement." It brought this action against Anderson's-Black Rock, Inc., a highway contractor, who used, in an allegedly infringing manner, a radiant energy generator manufactured and sold by Aeroil Products Company, Inc. Aeroil conducted the defense and is the real defendant.

The patent claims in combination the essential parts of a bituminous concrete paving machine together with a prescribed kind of radiant energy generator. The combination produces a fused bond between a course being laid and an adjacent course previously laid and grown cold. It has met with commercial success and is said to have acceptably answered a problem of long standing.

Bituminous concrete, the familiar black or dark material used for surfacing highways, parking areas, airport runways and taxi-ways, is ordinarily

laid in strips by a mobile machine. The material, preheated in a plant to more than 250°, is transported to the site and delivered into the hopper of the paving machine. The paver contains means to spread the material laterally and to smooth, tamp and shape it while the machine is in forward motion. It thus produces a continuous strip of bituminous concrete up to twelve feet in width. It is possible to have several pavers working in tandem so that each strip is laid before the adjacent strip has cooled, but that is frequently impossible. The need to maintain traffic and limitations upon the availability of equipment and of an adequate supply of the hot material frequently necessitate the laying of one strip at a time. In that event, the hot material of the second strip will not bind with the cold material of the first strip, leaving what has long been known as a "cold joint."

Where there is a cold joint, water and dirt will infiltrate. After some freezing and thawing, there will be raveling at the joint and early disintegration of the pavement.

The same problem, in a different context, was presented in the early days of the use of bituminous paving materials. When patching was necessary, the absence of bonding between the new, hot material and the old, cold material created the same openings for the seepage of water and dirt with their deleterious effect. Not surprisingly, attempts were made to obtain bonding by preheating the old material. The use of open flames, however, would carbonize the old material, accentuating, rather than alleviating, the difficulty. As early as 1905, Morcom Patent No. 799,014 taught the use of a radiant heat burner, with a solid bottom plate, and with side curtains which could be lowered to prevent the flow of cold air between the burner and the bituminous surface. There followed a number of other patents on heaters and associated equipment for

heating the old material during patching or surface smoothing operations.[1] British Patent No. 756,911 (1956) actually taught the use of a radiant heater to soften the edge of a previously laid strip of bituminous concrete before placing an adjacent course.

The difficulty with these earlier patented devices was that they would not work in commercial operation. Open flame devices which carbonized the material were detrimental, while the radiant heaters were ineffective because they produced insufficient penetrative heat to secure bonding of the old material with the new. The consequence was that the industry turned to other methods in its attempt to deal with the problem of cold joints.

When Neville, the patentee, came on the scene, the prevalent and preferred practice was far removed from the old idea of heat treatment. Before the second, adjacent course was laid, the edge of the first course was cut back for several inches, with pneumatic hammers or other devices, to produce a clean vertical surface, which was then painted with hot asphalt. This was expensive, of course, and there were other disadvantages. The cutting disturbed and weakened the structure of the first course, and the final surface was left with a built-in joint. It was not a solution of the cold-joint problem, but the best, known method of minimizing its adverse consequences.

The patentee, in seeking a solution, turned away from current concepts and harked back to the discarded notion of preheating the old material. His patent prescribes the use of a radiant energy generator, having as its base a plate of plastic or metal with many small perforations in it, so that it resembles a grid or gauze. The generator is so designed that combustion occurs in the perforations or adjacent to the perforated base plate. It produces highly penetrative radiant energy, with concentrated wave

1. Switzer Patent No. 1,136,294 (1915); Flynn Patent No. 2,053,709 (1936); Wells Patent No. 2,254,463 (1941); Fizzell Patent No. 2,705,906 (1955).

lengths of approximately three microns. Its use in conjunction with a bituminous paver results in complete bonding between the first course, grown cold, and an adjacent second course. The fusion is complete, and cores disclose no joint into which deleterious substances might seep or be worked. The combination was novel, and it has an obvious utility of practical and economic importance.

Neville was not the inventor of the generator. His is not unlike that disclosed in Schwank Patent No. 2,775,294 (1956). His contribution was the elimination of the cold joint in bituminous concrete paving, and his claims encompass no other uses of such generators. The question, then, is whether the solution "would have been obvious at the time the invention was made to a person having ordinary skill in the art * *" within the meaning of 35 U.S.C.A. § 103, as interpreted in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545. More specifically, the question is whether, in light of the availability of more efficient radiant energy generators, the answer obviously lay in the theretofore unworkable and discarded art of heat treatment. Our inquiry will be facilitated by resort to those "secondary considerations" which the Supreme Court recognized in Graham v. John Deere Co., as "indicia of obviousness or nonobviousness."

The appropriateness of the use of such considerations arises out of the necessity of framing the question of obviousness in terms of available knowledge at the time of the claimed invention and the desirability of avoiding subjective appraisals with high coloration from the patent's disclosure. As the Supreme Court said in Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527:

"Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skilful attention."

Similarly, in S. H. Kress and Co. v. Aghnides, 4 Cir., 246 F.2d 718, 723, we said:

"Obviousness does not mean that one skilled in the art can perceive the solution after it has been found and pointed out by someone else; the test of obviousness is as of an earlier time, when the search is on."

The usefulness of such considerations in providing objective indicia to guide decisions is well recognized.[2] The difficulty in obtaining reliable judgments without them was stated by Judge Learned Hand in Reiner v. I. Leon Co., 2 Cir., 285 F.2d 501, 503–504:

"The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not, 'obvious' is to substitute our igno-

2. See Skee-Trainer, Inc. v. Garelick Mfg. Co., 8 Cir., 361 F.2d 895; Jones Knitting Corp. v. Morgan, 3 Cir., 361 F.2d 451; Bentley v. Sunset House Distributing Corp., 9 Cir., 359 F.2d 140; Schnell v. Allbright-Nell Co., 7 Cir., 348 F.2d 444; M. B. Skinner Co. v. Continental Industries, Inc., 10 Cir., 346 F.2d 170; Allen v. Standard Crankshaft and Hydraulic Co., 4 Cir., 323 F.2d 29; Lorenz v. F. W. Woolworth Co., 2 Cir., 305 F.2d 102, and dissenting opinion on 106; Honolulu Oil Corp. v. Shelby Poultry Co., 4 Cir., 293 F.2d 127; Reiner v. I. Leon Co., 2 Cir., 285 F.2d 501; Safety Car Heating and Lighting Co. v. General Electric Co., 2 Cir., 155 F.2d 937; Blumcraft of Pittsburgh v. United States, 372 F.2d 1014, 178 Ct.Cl. 798; Application of Polson, C.C.P.A., 368 F.2d 267.

rance for the acquaintance with the subject of those who were familiar with it."

With such criteria, however, reliable guideposts can be erected. As we said in Allen v. Standard Crankshaft and Hydraulic Co., 4 Cir., 323 F.2d 29, 34:

"In approaching the question of obviousness, however, judges should mistrust their subjective notions if there are objective indicia to guide their judgments. Though the answer after the event may appear simple, the Court should not convert its simplicity into obviousness in the face of hard proof of recognized need for the answer, of long, unsuccessful search for the answer by people of skill in the art, of recognition by the industry that the claimed invention was the answer, and of its prompt adoption with attendant commercial success. Even a substantial combination of some of such criteria ought to outweigh a judge's subjective conviction that if one as skilled as he had really looked for the answer, he immediately could have put his finger upon it."

With that introduction, we turn to those secondary considerations as disclosed in this record.

Clearly, there had been a long felt need for a solution of the cold joint problem. Morcom sought it in 1905, and, in his patent, he recites earlier attempts to find it. The cluttered field attests the continuity of the search, and the testimony of the experts demonstrates the gravity of the problem and recognition of continuing need for a more satisfactory solution than cutting back the edge of the first course.

If it be said that the solution was dependent upon the development of generators of the Schwank type, the answer did not come with their appearance. Schwank applied for his patent eight years before Neville's application, and the Schwank patent issued more than two years earlier.

That the bituminous paving industry was not expecting a solution through the development of new generators is dramatically illustrated by the incredulity with which it received Neville's concept.

Neville approached the Director of Research of the Pennsylvania Department of Highways, and explained to him the equipment he had and what it would do. The Director testified that Neville was an imposing, impressive man, but that he simply did not believe him.

Neville sought to interest the engineer in charge of the maintenance and construction of Air Force bases, but that official testified that he did not believe Neville's equipment would work. Crowley, the Air Force engineer, remained unconvinced until he received a report of a demonstration Neville finally arranged in California. An official of California's Department of Public Works informed Crowley of the success of the demonstration, adding that, if he had not seen it himself, he could not have believed it. Only after that was the Air Force willing to experiment with Neville's equipment.

The fact that experts in the field received Neville's disclosure with such skepticism and disbelief strongly indicates that, at the time, a person of ordinary skill in the field would not have sought the answer in the disproven method of heat treatment.

After demonstrations verified Neville's claims, they have met with substantial commercial success. The Air Force and some states prescribe the use of such equipment; other states use it. Patents have been obtained in the United Kingdom, Canada and Mexico. Foreign and domestic concerns have obtained licenses, and others have purchased the complete equipment from Pavement Salvage without attempting to circumvent the patent. Only Aeroil sought to operate independently and to contest the patent's validity. In doing so, it sold its equipment widely, domestically and abroad.

In promoting the sales of its own products, Aeroil paid high tribute to the new concept. In its catalogues it de-

clared that with the new equipment a "truly homogenous joint is obtained," "a perfect bond." In one of its bulletins it went further when it proclaimed, "This remarkable new development is a dramatic breakthrough * * * INFRA–RED heat is not new, but the application is revolutionary * * *." Words extolling its own products in sales promotional material should be discounted, perhaps, but the "dramatic breakthrough" was Neville's; the "revolutionary" application of the energy was his, not Aeroil's. Such statements, of course, are quite inconsistent with Aeroil's present position that what Neville did would have been obvious to a person having ordinary skill in the art.

■■ As we have indicated, it is not contended that Neville's claims are anticipated by any prior art patent. It is contended that three or more of them, together, disclose all that Neville claimed, and that because he cannot separately claim the generator or the basic paving machine, he cannot claim the combination. The defense is simply obviousness. The prior art, however, is predominantly a long history of failure to solve the problem by heat treatment. At a time when the industry was concentrating on a quite different, though expensive, partial corrective, there was nothing in the junk pile of prior art heat treatment patents to make it obvious to anyone that they supplied the ultimate solution. That this is so is forcefully demonstrated by the duration of the fruitless search, by the skepticism and incredulity with which experts in the field received Neville's disclosure, by its commercial success after demonstrations dissipated the disbelief of the experts, by the conduct of competitors in accepting licenses and purchasing equipment and the bold tribute of the alleged infringer in hailing it as the very antithesis of the obvious.

The District Court was not unimpressed with all of this, but it viewed the question as if it were known that the answer lay in heat treatment and that a genera-

tor of the type described by Neville would do the job. Had it been known that the result could be achieved by a generator and a paving machine handled separately but cooperatively, combining the two in one machine for the sake of convenience would have been an obvious step, but that was not known. Neville supplied the whole of the answer which had completely eluded the industry. His contribution cannot be judged without reference to its salient feature, disclosure of the fact that the solution lay in the use of a specified kind of infra-red generator in combination with the basic paving machine.

We reverse the judgment holding the patent invalid and remand for further proceedings on the infringement and other issues.

Reversed and remanded.

CRAVEN, Circuit Judge (dissenting).

The court concedes, as I read the opinion, that what makes the thing work is better radiant heat generators of the Schwank type. It is not even contended that Pavement Salvage can monopolize such improvements. Nor is it demonstrated to my satisfaction that the combination on one chassis of the paving machine and heat generator is necessary to produce the desired result. Yet, the combination is held patentable, though for all we know the same desired result may be achieved by two machines juxtaposed and separately propelled.

I adopt what was said by Judge Field in his unpublished opinion below:

"[P]laintiff has combined four elements which were known in the prior art. Three of the elements, the screed, leveler and spreader, when constructed on one chassis would not be a patentable invention. However, plaintiff added to this combination the element of a radiant burner. The burner, by itself, is also not patentable. Therefore, the question here is whether the addition of the burner to the paving machine which contains the other three elements has

overcome the obviousness of the total combination.

"* * * Plaintiff's patent is a combination patent. The question of radiant heat was old in the art. The pivotal question would more logically appear to be, assuming that the radiant heat would work effectively, was it obvious that a more successful machine would evolve if all of the elements were constructed on one chassis? It is my opinion that such a combination was reasonably obvious to one possessing ordinary skill in the art.

&ast; &ast; &ast; &ast; &ast; &ast;

"In [Great] A & P Tea Co. v. Supermarket [Equipment] Corporation, 340 U.S. 147 [71 S.Ct. 127, 95 L.Ed. 162] (1950) the Court made the following statements:

'It is agreed that the key to patentability of a mechanical device that brings old factors into cooperation is presence or lack of invention.

&ast; &ast; &ast; &ast; &ast; &ast;

'The negative rule accrued from many litigations was condensed about as precisely as the subject permits in Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549 [58 S.Ct. 662, 82 L.Ed. 1008]: "The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention."

'The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics.'

"The Court then makes this meaningful observation:

'Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements.'

"Plaintiff contends that its combination of elements has solved the age-old problems of asphalt paving; that the invention has, by its combination, produced a new result which has advanced the art, and further points to its commercial success and the fact that it has answered a long-felt want.

"Entron of Maryland v. Jerrold [Electronics Corp.], 295 F.2d 670 (4th Cir. 1961), set forth the standard for determining whether the elements of a combination exhibit a new result in the following language:

'The inquiry should more appropriately be directed to whether the elements of the combination perform or produce a new, different or additional function or operation * * * in the combination than that theretofore performed or produced by them.'

"It is my opinion that plaintiff's combination in no way exceeds the sum of its parts. Each element of the combination performs in the same manner and performs the same job that it formerly did when not in combination. All that plaintiff has done is to construct four elements known in the prior art on one chassis. In regard to plaintiff's contention of commercial success, see A & P Tea Co. v. Supermarket Corp., supra, at 153, wherein the Court stated:

'The Court of Appeals and the respondent both lean heavily on evidence that this device filled a long-felt want and has enjoyed commercial success. But commercial success without invention will not make patentability * *.'

"Based upon the foregoing, it is my opinion that the Neville patent is not a valid patent. * * *"

I think Judge Field correctly adjudged invalidity of the patent and that the court, in reversing his decision, ignores the teaching of Lincoln Engineering Co.

v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008 (1938), relied upon by the district court.

I respectfully dissent.