53 CCPA

**Application of Donald E. DAILEY and Anton F. Eilers.**

**Patent Appeal No. 7491.**

United States Court of Customs and Patent Appeals.

March 24, 1966.

Smith, J., dissented.

John Rex Allen, Chicago, Ill. (Richard S. Phillips, Chicago, Ill., of counsel), for appellants.

Clarence W. Moore, Washington, D. C. (J. F. Nakamura, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

WORLEY, Chief Judge.

This appeal is from the decision of the Board of Appeals which affirmed the examiner's rejection of claims 25–28 in appellants' application [1] for "Nursing Container."

The invention relates to a disposable nursing container for infants. Appellants state:

> The nursing container with which the invention is concerned is collapsible so that air is not admitted as the contents are drained. Accordingly the likelihood of the infant swallowing air during feeding, believed to be a major cause of colic, is reduced.

> \* \* \* \* \* \*

> A further feature is that the top section of the container has the nipple receiving opening therein and the bottom section is collapsible into the top section. The bottom section is more flexible than the top section to facilitate the collapse thereof.

The particular construction which appellants disclose to achieve those results is illustrated in the following drawings:

[1]. Serial No. 814,110, filed May 18, 1959.

Appellants describe that construction and its use in their specification as follows:

Top and bottom sections 11 and 12 of container 10 are preferably of a thin formed plastic sheet material or the like. By "plastic" any suitable flexible material is intended, including rubber, synthetic plastics and the like. * * * Both sections have a generally spherical configuration and are somewhat less than hemispherical in extent. In the specific container illustrated in the drawings, the two sections are defined by a central angle of the order of 80°. This relationship provides a finished container which has a rounded configuration and is convenient to hold. * * *

* * * * * *

At the time of feeding, * * * pressure [is applied] to the wall of the container forcing the nipple out. At the same time, any air left in the container during filling is expelled through the nipple so that the infant swallows no air from the container. * * *

* * * * * *

If the infant requires stimulation to cause it to nurse properly, a slight pressure applied to the bottom of the container by the palm of the hand forces some of the formula out through the nipple into the infant's mouth. As the formula is withdrawn from the container the bottom section 12 collapses within the upper section 11 as indicated in Figure 6 forcing formula into the nipple keeping it filled. This collapse starts at the juncture line 13 between the container sections and progresses inwardly therefrom so that formula is not trapped between collapsed portions of the bottom section wall and the wall of the top section. *It is not necessary for air to enter the container as the formula is withdrawn and the cross cut nipple acts as a check valve allowing only the outward flow of formula and restricting inward flow of air.* Thus the likelihood of the infant swallowing substantial quantities

of air during nursing is reduced. As the container and nipple are free of air at all times during feeding, it is not necessary that the container be elevated above the infant, but it may be in any position above or below. * * * [Emphasis supplied.]

Claim 25 is illustrative:

25. A disposable, plastic infant nursing container of the character described, comprising: a top section of self-sustaining formed material having a nipple opening therein; a bottom section of self-sustaining, formed flexible plastic material sealed to the first section and collapsible thereinto, said bottom section being more flexible than the top section and having a shape such that in the collapsed condition is closely mated with the interior of the top section, said bottom section retaining a position in which it is placed, whereby the bottom section readily collapses upon the withdrawal of the container contents, without retarding or aiding the flow of the contents therefrom; and a nipple mounted on said top section and communicating with the opening therein, said nipple having a slit therein defining a valved nursing opening, whereby the interior of the container is sealed and during nursing the container contents are withdrawn without admission of air to the container, causing collapse of the bottom container section.

Claim 26 defines the valved nursing opening as a cross-cut valve. Claim 27, while defining no particular nipple opening structure, recites the configuration of the top and bottom sections of the container as that of "a portion of a sphere less than a hemisphere." In claim 28, the central angle of those spherical portions is about 80°.

The references are:

Matzen     554,071   February 4, 1896.
Bardin     2,433,806 December 30, 1947.
Allen      2,446,451 August 3, 1948.
Blanchett  2,989,961 June 27, 1961.

Matzen's nursing bottle is shown in the following drawing:

Matzen's object is:

\* \* \* to provide a bottle in which no air is admitted and in which no vacuum is formed as the milk is withdrawn by the baby, and \* \* \* to provide a bottle from which the milk will flow continuously and evenly, whatever the size of the opening in the nipple.

The patentee describes his construction as consisting

\* \* \* of a nursing-bottle made of two parts, one of which is flexible, the other rigid, and in which the flexible part operates to prevent a vacuum in the bottle as the milk is drawn out by the child and promotes evenness in the flow, \* \* \*.

\*　　\*　　\*　　\*　　\*　　\*

\* \* \* Fig. 2 is a view of said bottle when the two parts are connected and the bottle has been substantially emptied, the flexible part in this case being drawn into the rigid part.

While part A is made of a rigid material, part B consists of

\* \* \* flexible material so thin and light that it will readily respond to the suction of the infant through the nipple and surrender itself to such suction with practically no resistance whatever of its own, thus following the withdrawal of the milk and at last losing itself bodily in the upper half, A, and filling the space thereof, as seen in Fig. 2. I believe that a good quality of elastic rubber is the best material from which to make the part B, and now use very thin vulcanized rubber for this purpose. \* \* \*

Matzen describes the use of his container thus:

\* \* \* The nipple is put on and then the collapsible part B is compressed until all of the air is forced out through the hole in the nipple, whereupon the bottle is ready to give to the child. As the baby sucks the milk from the bottle, the collapsible part B is gradually drawn into the part A, thus reducing the capacity of the bottle, and this goes on until the milk is withdrawn and said part B substantially fills the part A, \* \* \*.

Matzen noted several problems with respect to "ordinary" nursing bottles. In the use of the ordinary rigid glass bottle, the nipple construction necessarily must allow air to be admitted into the bottle, or the flow of milk will cease. Thus the infant had to stop sucking frequently in order that air may be admitted. The presence of air in the bottle results in the baby sucking in air with the milk, with colic as a consequence. The nipple opening in the ordinary bottle had to be relatively large; if small, on the order of a pinhole, the rubber surrounding the hole effectively sealed the nipple opening to entry of air and prevented further withdrawal of milk as well. On the other hand Matzen stated:

\* \* \* if the hole in the nipple is so large that it will not close up and exclude the air, it is at the same time so large that the baby gets the milk too fast.

With my bottle the finest pin-hole may be formed in the nipple, and a

small but regular and uninterrupted stream will flow through it.

Matzen also noted his bottle

> \* \* \* has the exceptional and distinguishing advantage of being ready to yield its contents to the child whatever the position of the bottle may be. Indeed, one position is practically as good as another and the milk comes freely in all positions. \* \* \*

A detailed discussion of Allen appears unnecessary, beyond noting he discloses a similar nursing container having a bottom portion which

> \* \* \* automatically collapses and retracts into the rigid neck as the last of the liquid is sucked from the container by an infant using the nursing unit, in this way providing a non-colic nursing unit in view of . the fact that no accumulation of air is permitted within the container.

Blanchett discloses a nipple construction for use with ordinary rigid nursing bottles in which the nipple opening may consist of a cross cut, an I cut, a Y cut, a single hole, or multiple holes. Blanchett states:

> \* \* \* The various "cuts" are preferable to the holes because they do not leak when the nursing unit is turned upside down. Neither do they become plugged.

The board did not find it necessary to discuss Bardin, nor do we.

The board agreed with the examiner that claims 25–28 were unpatentable over Matzen or Allen in view of Blanchett. It found claims 25 and 26 to distinguish over Matzen only in terms of the type of nipple opening employed, and claims 27 and 28 to distinguish only in reciting a "less than a hemisphere" configuration. In answer to appellants' argument that their particular slit nipple opening provides a self-sealing action to prevent continuous

flow and loss of formula from the nurser, the board noted that Blanchett fully appreciated the ability of such an opening to prevent leaks. With respect to claims 27 and 28, it further agreed that the configuration of the container is a "mere matter of choice" not significantly novel over Matzen.

Appellants urge that Matzen is devoid of any suggestion of the desirability of combining a collapsible container with a valved nipple which is responsive only to the sucking of the infant, thereby providing intermittent milk flow. Indeed, appellants state that Matzen promotes the idea of a nipple with a pinhole in it as desirable in order to obtain regular and uninterrupted flow of milk from the container.[2] It is appellants' position that the prior art recognizes neither the problem nor result desired and cannot be said to suggest a solution to the problem.

Taking appellants' argument at face value, we think one skilled in the art could hardly be unaware, after reading Matzen, that continuous flow or leakage might be an undesirable feature of the Matzen nursing container construction. Blanchett also recognizes the problem of fluid leakage from a hole opening in a nipple when the container is held upside down and, in a matter-of-fact manner, discloses the solution to that problem— the use of a "slit" nipple opening. We think one of ordinary skill in the art would find it obvious to use the slit nipple of Blanchett in the collapsible container of Matzen in order to achieve intermittent flow responsive to sucking.

As noted above, Matzen discloses that the flexible portion of his container is drawn into the rigid top portion, filling the space thereof. Appellants have presented no argument which convinces us that the particular configuration of their container is significant or is anything more than one of numerous configura-

2. As the Solicitor points out, it is not at all certain that appellants' interpretation of Matzen is consistent with the actual teaching of that reference. While appellants interpret Matzen as disclosing a container which provides a continuous flow of milk at all times, it seems equally likely that Matzen's container, having a nipple with a pinhole, provides a continuous flow only so long as the infant is sucking, which the infant may do without necessity of stopping to allow air into the container.

tions a person of ordinary skill in the art would find obvious for the purpose of providing mating surfaces in the collapsed container of Matzen. See Graham v. John Deere Co. of Kansas City, 86 S.Ct. 684.

The decision of the board is affirmed.

Affirmed.

SMITH, Judge, dissenting.

The majority opinion stands without support as to either the facts upon which it predicates the opinion or the law which it applies thereto. Its logic is the fallacious logic which leads to the conclusion that since each of the words in Lincoln's "Gettysburg Address" were individually old and well known at the time he used them, it would have been obvious for anyone of ordinary skill with a dictionary before him, to have written it. It is this logic which supports the conclusion of the majority here from which we may assume that today with "The Gettysburg Address" before him, it would be obvious for any school boy to select the same words and place them in the same order.

The fallacy I find in the majority opinion has its genesis in its simply ignoring those facts of record which do not support its conclusion. Ignoring these facts also requires the majority to ignore the precise wording of the claims directed thereto. This is understandable for unless the majority opinion is so construed, there is no support for its result.

As a preliminary observation it is to be noted that all the appealed claims are drawn to a *combination* of elements which separately may be old. This, however, does not warrant the majority in treating the claims as claims to the *individually old elements*. It is the new *combination* of these elements which is claimed.

It is this *combination* which must be found to be obvious under the conditions of 35 U.S.C. § 103 before the majority opinion can be justified.

The initial fallacy requires the majority to ignore the express limitations contained in 35 U.S.C. § 103 and to ignore the legislative intent which seems to have been clearly expressed thereby. The section explicitly provides that the determination of obviousness must be made on the basis of (1) considering "the invention as a whole" and (2) determining the issue of obviousness "as of the time the invention was made." The failure of the majority to here apply these portions of section 103 constitutes what I deem to be a grave error of law therein.

A proper reading of the statute shows the care with which section 103 was drawn to provide safeguards against the use of hindsight reconstruction of the art as has happened in this case. A proper respect for these safeguards would have avoided the fallacies which underlie the majority opinion.[1]

Turning to the appealed claims let us see what, in fact, they embrace. As will be shown, the appealed claims embrace significant features other than the collapsible wall of the container and the valved uni-directional flow nipple. Yet the majority rests its opinion on these features. No useful purpose will be served in repeating the features of the claims recited in the majority opinion. I fail, however, to find in the majority opinion any comment on the following features specifically set forth in appealed claim 25:

(1) a "*disposable*, plastic infant nursing container," in which

(2) the flexible bottom portion is "sealed to the first section" and

---

1. It seems necessary from time to time to comment on the human frailty in judging what *was* in the light of the *fait accompli* of the invention. This frailty is so old that a repetition of Milton's comments of some 300 years ago in "Paradise Lost" seems both appropriate and timely here.

"The invention all admired, and each how he
To be the inventor missed; so easy it seemed,
Once found, which yet unfound, most would have thought
Impossible!" (Part VI, L. 478–501)

(3) the shape of the flexible bottom section is "such that in the collapsed condition it closely mates with the interior of the top section" and

(4) the nipple has "a slit therein defining a valved nursing opening, whereby the interior of the container is sealed and during nursing the container contents are withdrawn without admission of air to the container, causing collapse of the bottom container section."

The fact is that the art relied upon by the majority is not concerned with providing a *disposable* container of the type here under consideration and having the claimed features specified in claim 25. While Allen shows a retractable disposable container, its use requires a rigid neck unit which obviously is not intended to be disposed of when the container is thrown away. The Matzen construction clearly is not of the disposable container type. Instead, the construction is such as Matzen states that:

\* \* \* The bead or rib *b* engages in groove *a'* and helps to make the engagement effective, and yet leave the parts free for the nurse to detach and wash and cleanse as they require.

Neither Allen or Matzen "seal" the flexible bottom section to the top section as disclosed by appellants and as claimed in claim 25.

Claim 25 also calls for the collapsed bottom section to be closely mated with the interior of the top section. Allen clearly shows no such concept. In Matzen the flexible bottom portion formed of flexible rubber may be drawn into the rigid top portion as the bottle is emptied, but is it closely mated as required in claim 25? I think not, as the view of Fig. 1 of Matzen clearly shows.

Neither Allen or Matzen shows a nipple of the type required to meet the language of the claim. Appellants explain that the nipple as shown and claimed will provide an intermittent valved flow.[2] They state in their specification:

\* \* \* It is not necessary for air to enter the container as the formula is withdrawn and the cross cut nipple acts as a check valve allowing only the outward flow of formula and restricting inward flow of air. Thus the likelihood of the infant swallowing substantial quantities of air during nursing is reduced. \* \* \*

Thus, it is the outer extremity of appellants' nipple which contains a slit which is normally closed. This slit opens in response to an infant's nursing. Absent a sucking action by the infant the slit remains closed. The decrease in pressure generated by such sucking opens the slit and causes nutrient to flow from the container. During outward flow of the nutrient, the top portion of the container remains rigid. However the bottom portion, being of flexible self-sustaining material, collapses into the top portion as the nutrient flows outward. When the flow stops, the bottom portion sustains its position. With this construction there is no entrapment of air or fluid within the folds of the collapsible container and the flow of nutrient stops when the infant stops sucking on the nipple.

This, however, does not preclude the majority from finding it obvious to use such a nipple. It finds the cross slitted nipple shown in one view of the nipple disclosed in the Blanchett reference. The majority opinion is silent as to how the Blanchett nipple *as disclosed*, when placed on the Allen or Matzen bottles, would let fluid out *without* letting air in. Unless this can be done, the purpose of Allen and Matzen is defeated, for if air enters as the fluid is drawn out, the flexible portions simply cannot be drawn into the rigid top portions as the majority finds Allen and Matzen intended.

If any one portion of the majority opinion can be said to be more unfair to appellants than another, it is the portion dealing with the Blanchett reference. Af-

2. In Matzen, the nipple opening is open at all times. No intermittent flow concept is suggested.

ter ignoring Blanchett's entire invention, the majority after viewing appellants' construction selects from the Blanchett construction the following:

Blanchett discloses a nipple construction for use with ordinary rigid nursing bottles in which the nipple opening may consist of a cross cut, an I cut, a Y cut, a single hole, or multiple holes. Blanchett states:

* * * The various "cuts" are preferable to the holes because they do not leak when the nursing unit is turned upside down. Neither do they become plugged.

The use of the cross cut nipple *without* an air vent is first disclosed in this record by appellants. *It is not disclosed in the Blanchett reference.* Instead of a nipple for keeping air out of the bottle, what Blanchett proposes is

* * * an improved nipple as a result of having a *new large capacity air valve which opens when suction is applied to the nipple,* permitting adequate amounts of air to enter the nursing bottle, and which closes effectively when suction is released, preventing the contents of the bottle from leaking out. [Emphasis added.]

Blanchett describes the valve operation as follows:

The principle of operation of this valve is as follows: When the infant sucks through the sucking opening 9 the pressure within the bottle is decreased relative to atmospheric pressure. When the pressure difference is great enough to overcome the natural resiliency of the valve, the *aperture 2 opens* as shown in FIGURE 2, *permitting external air to rush through the ends of the tube and through the valve aperture into the bottle,* as shown by the arrows in FIGURES 2 and 7. When the infant stops sucking and the pressure differential lessens, the natural resiliency of the tube snaps the valve aperture shut preventing leakage. The valve in the closed position is illustrated in FIGURES 1 and 6. [Emphasis added.]

Should any question remain as to what the Blanchett air-valve nipple will do, it is answered by Blanchett as follows:

Thus, it will be seen that a more efficient nipple has been provided which contains a new effective air valve. In particular, the advantages and conveniences of this air valve in a baby nipple are mainly:

(1) The size of the valve aperture allows a larger volume of air to flow into the bottle in proportion to the infant's sucking effort than the old pin holes, vents, ridges and grooves.

(2) The valve has a more positive and effective closing action which prevents leakage.

(3) The valve does not become plugged even by the coarsest formula.

(4) No loosening or adjusting of the retaining screw cap which formerly caused leakage, is necessary.

(5) The valve is easily cleaned with soap and water. A pipe cleaner or small brush may be run through it to satisfy the most meticulous.

(6) The valve does not in any way interfere with sterilization or with transportation of the nursing unit when using the sealing disc.

The fallacy in the majority opinion, as it was in the opinion of the board, lies in ignoring the specific teachings of Blanchett *which require that air be admitted to the container through his special large capacity air valve nipple.* To adapt the Blanchett nipple, *without the changes first suggested by* appellants, to the Matzen or Allen constructions would defeat the entire purpose of the collapsible portion of the Matzen or Allen constructions.

On the present record the first suggestion of the *combination* of the flexible wall construction and the one way nipple was made by appellants.

The majority opinion states:

* * * We think one of ordinary skill in the art would find it obvious to use the slit nipple of Blanchett in the

collapsible container of Matzen in order to achieve intermittent flow responsive to sucking.

As above pointed out, "the slit nipple of Blanchett" simply does not exist except in combination with the air valve. Its purpose is to *let air into the bottle.* The majority does not explain and I am at a loss to understand how the Matzen container with *the entire Blanchett nipple* on it can collapse or how it can provide a container in which air is excluded during nursing.

Under comparable circumstances, this court in In re Shaffer, 229 F.2d 476, 43 CCPA 758, stated the view that:

> * * * a person having the references before him who was not cognizant of appellant's disclosure would not be informed that the problems solved by appellant ever existed. Therefore, can it be said that these references which never recognized appellant's problem would have suggested its solution? We think not, and therefore feel that the references were improperly combined since there is no suggestion in either of the references that they can be combined to produce appellant's result.

Further, I fail to see how the combination created by the majority would provide the result called for in the "whereby" clause of claim 25 which reads as follows:

> * * * whereby the interior of the container is sealed and during nursing the container contents are withdrawn without admission of air to the container, causing collapse of the bottom container section.

What has been said above as to claim 25 and the failure of the references to make its distinctive features obvious, applies also to the other appealed claims. Thus claim 26 requires "a cross-cut valve" in the end of the nipple in the novel *combination* claimed in claim 25.

While all of the above features also are inherent in appealed claim 27, this claim further defines the shape of the top portion of the container as follows:

> * * * a top section of self-sustaining formed sheet material having a configuration generally that of a portion of sphere less than a hemisphere * * * It defines the bottom section as follows:

> * * * a bottom section of formed flexible plastic material having a configuration of a portion of a sphere less than a hemisphere and of a size substantially the same as that of the top section * * *

Further limitations as to the shape of the container are found in claim 28 as follows:

> * * * wherein said top and bottom sections each are portions of a sphere of equal diameter, the portions being defined by a central angle of the order of 80 degrees and the sections are sealed together along a planar, circumferential area, said sealed area extending outwardly from the container.

These distinctions are ignored by the majority, apparently for the stated reason that:

> * * * Appellants have presented no argument which convinces us that the particular configuration of their container is significant or is anything more than one of numerous configurations a person of ordinary skill in the art would find obvious for the purpose of providing mating surfaces in the collapsed container of Matzen. * * *

It is seldom that one finds so clear a case of (1) ignoring an appellant's teachings and (2) of hindsight reconstruction of the art in view of appellants own disclosure. Upon turning to the record, we find the majority's statement to be totally without support. In appellants' specification it is stated that:

> * * * Both sections have a generally spherical configuration and are somewhat less than hemispherical in extent. In the specific container illustrated in the drawings, the two sections

are defined by a central angle of the order of 80°. *This relationship provides a finished container which has a rounded configuration and is convenient to hold.* * * * [Emphasis added.]

Appellants also disclose that the particular shape of their container is a convenient one for use and go to some lengths in describing how it can be readily held. Thus in their specification it is stated:

* * * In nursing an infant, the container is preferably held as illustrated in Figure 7 with the second finger inserted through opening 38 in a tab 39 extending outwardly from the juncture line 13 of the container sections, and preferably formed as an integral part of the sections. *The peripheral edge 40 of the two container sections is grasped by the thumb and forefinger one one side of tab 39 and by the third and little finger on the other side with the bottom of the container resting against the palm of the hand. This is an extremely stable support for container 10 which may readily be moved to accommodate changes in the position of the infant.* The thin peripheral flange and light weight of the container permit the baby to hold the container and feed itself at an earlier age than with a heavy glass nursing bottle. [Emphasis added.]

Should this not be a sufficient argument in favor of the particular configuration of the container, the specification also states:

* * * The over-all shape of the container conforms generally with the shape of the mother's breast adding further inducement to the baby to nurse.

To the foregoing, I would add the observation that when one starts with the concept of a disposable device, the factor of cost becomes an important consideration. It is a known fact of which the majority should have taken judicial notice that the spherical form provides the most efficient form of container in terms of the amount of surface materials required for a container of a given capacity. Thus, it seems to me the shape of the container *as claimed* is its own most effective "argument" as to the importance of the claimed shape for, the closer the shape approaches that of a true sphere, the more efficient becomes the use of the surface forming materials and hence the lower the material cost of the container. The art of record is devoid of any such concept.

It should be clear from the foregoing that "the invention as a whole," with which we should be here concerned under the mandate of 35 U.S.C. § 103, is a unitary whole, in this case a *disposable* infant feeding device which on this record is *unique in concept* and *novel and unobvious in construction.* By the simple expedient of ignoring the phrase in section 103 "at the time the invention was made," it has been possible for the majority to use appellants' own teachings as the basis for its hindsight reconstruction of the art upon which it bases its finding of obviousness.

But is the "invention as a whole" simply the gathering together of individually old elements in the art? The majority obviously thinks it is and appears to be satisfied to predicate its decision on the showing of a prior art bottle having a collapsible wall construction to which it adds an *air vented* nipple construction from another patent. While the majority has seen fit to pay lip service to the decision in Graham v. John Deere Co. of Kansas City, 86 S.Ct. 684, it is my opinion that it has ignored the fundamental rationale of the case which, as I view it, would prohibit the type of obviousness rejection which the majority here affirms. That rationale requires us to follow the conditions of section 103 "realistically;" to place the emphasis on "inquiry, not quality;" and to make the "basic factual inquiries" (1) as to the scope and content of the prior art, (2) the differences between the prior art and the *claims* at issue, and (3) the level of ordinary skill in the art.

Such a factual inquiry should start with asking the fundamental question as to "why" appellants sought the claimed construction. As we pursue the answer to this question we begin to see that factually their "invention as a whole" embraces more than the factors considered by the majority. Perhaps we can find the factual answer to this "why" in the frustration of a parent who has walked the floor with a crying infant who, nursed with a Blanchett nipple, has ingested a large quantity of air with its feeding. Perhaps it is to be found in the concern of harassed nurses in a maternity ward who face the same problem without the time or patience to walk the floor with each similarly distressed infant. Perhaps it is found in the demands of the modern mother who wants all things, particularly feeding formulas for her baby, nicely prepackaged in a sterile container which is easy to use and inexpensive enough to be thrown away, thus eliminating the troublesome washing and sterilizing of the prior art units to permit their intended reuse.

Wherever we may go to find the answer as to "why" appellants concerned themselves with this problem is of little present moment except to suggest the various factual facets of the pre-existing problem which on this record was first solved by the nursing device here claimed.

It is seldom that we find as clear a case of pure hindsight reconstruction of the prior art as is found in the present majority opinion. I do not consider this to be the type of factual "inquiry" stressed by the Supreme Court in the *Deere* case, supra. Apparently impressed by the admitted simplicity of the claimed device, the reasoning of the majority, which it seems to me is substituted for a *factual* inquiry, seems to come down to this, "we have seen appellants' device; it is simple; ergo it is obvious." Such reasoning indeed lends support for the callous observation of some years ago which has been attributed to Mr. Causten Browne that "If it [the invention] is so simple that a judge can understand it, then it is not in-

vention." It is here the caution stated in Allen v. Standard Crankshaft & Hydraulic Co., 323 F.2d 29 (4th Cir. 1963) should be observed:

In approaching the question of obviousness, however, judges should mistrust their subjective notions if there are objective indicia to guide their judgments. Though the answer after the event may appear simple, the Court should not convert its simplicity into obviousness in the face of hard proof of recognized need for the answer, of long, unsuccessful search for the answer by people of skill in the art, of recognition by the industry that the claimed invention was the answer, and of its prompt adoption with attendant commercial success. Even a substantial combination of some of such criteria ought to outweigh a judge's subjective convictions that if one as skilled as he had really looked for the answer, he immediately could have put his finger upon it.

Unfortunately the *simplicity* of the present device has been converted into *obviousness* by the majority. There is indeed no great "mystery" about the present invention which can be secreted in some exotic chemical formula. There is here no great scientific "breakthrough" which can be expressed in the mystique of mathematical symbolism. But are these the requirements to be met before an invention is patentable under 35 U.S.C. § 103? I think not. As stated by Judge Learned Hand in Reiner v. I. Leon Co., 285 F.2d 501 (2d Cir. 1960):

* * * To judge on our own that this or that new assemblage of old factors was, or was not, "obvious" is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it. * * *

Here as in many commercially significant inventions, the simplicity of the device is the very thing which had eluded the art. Here as in Dewey v. Almy Chem.

Co. v. Mimex Co., 124 F.2d 986 (2d Cir. 1942):

> * * * It would indeed be absurd to rank the invention as a great pioneer such as come only at rare intervals and are the work of genius. * * * These inventors did not move along a well-marked way; they struck out a new path which led to a goal that men had unsuccessfully tried to reach for many years. To say that for this they needed to look no further afield than the ordinary routineer, one must shut one's eyes to all the significant facts.

The fallacies of the majority here seem to me to be the same as those on which the unaccepted position of the Government was predicated in United States v. Adams, 86 S.Ct. 708. In concluding that the Adams battery was non-obvious, the court pointed to the operating characteristics of the Adams battery which it found to be "unexpected and to have far surpassed then-existing wet batteries." The opinion then continues, at USPQ 483–84:

> * * * Despite the fact that each of the elements of the Adams battery was well known in the prior art, to combine them together as did Adams required that a person reasonably skilled in the prior art must ignore that (1) batteries which continued to operate on an open circuit and which heated in normal use were not practical; and (2) water-activated batteries were successful only when combined with electrolytes detrimental to the use of magnesium. These long-accepted factors, when taken together, would, we believe, deter any investigation into such a combination as is used by Adams. This is not to say that one who merely finds new uses for old inventions by shutting his eyes to their prior disadvantages thereby discovers a patentable innovation. We do say, however, that known disadvantages in old devices which would naturally discourage the search for new inventions may be taken into account in determining obviousness.

For the foregoing reasons, I would reverse.