**Francis P. BRENNAN, Plaintiff,**

v.

**MR. HANGER, INC. and Sal Grinding, Inc., Defendants.**

**No. 77 Civ. 3567 (WCC).**

United States District Court,
S. D. New York.

Sept. 12, 1979.

Motion for Reconsideration, Denied
Jan. 21, 1980.

As Amended Feb. 1, 1980.

Kane, Dalsimer, Kane, Sullivan & Ku-rucz, New York City, Hill, Van Santen, Steadman, Chiara & Simpson, P. C., Chicago, Ill., for plaintiff; David H. T. Kane, New York City, James Van Santen, Brett A. Valinquet, Chicago, Ill., of counsel.

Bertram Frank, P. C., New York City, for defendants.

## OPINION

CONNER, District Judge:

This is an action for alleged infringement of three United States patents relating to hanger bars which extend across the upper ends of garment shipping containers to support the garment hangers.

The three patents in suit were owned by plaintiff Francis P. Brennan ("Brennan") at the time the action was filed. Before trial, they were assigned to Estad Products, Inc. ("ESTAD") which was accordingly added as a party plaintiff.

The action was tried by the Court without a jury commencing January 16, 1979. This Opinion incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.

### The Parties

Plaintiff Brennan is an individual residing in Lisle, Illinois. During the conception, design and development of the devices covered by the patents in suit, he was President of Brennan Engineering Corporation ("Brennan Engineering"), an Illinois corporation engaged in the metal fabricating business. The company had no separate research and development department, these functions being performed in the tool and die department, with Brennan having primary design responsibilities.

Defendant Mr. Hanger, Inc. ("Mr. Hanger") is a New York corporation having its principal office at 20 Jones Street, New Rochelle, New York. It employs approximately 400 persons in the business of manufacturing and selling molded plastic garment hangers, which are made at its plant in Ringtown, Pennsylvania. Lawrence Rosen is its Chairman and Chief Executive Officer and a minority stockholder. It employs a sales force of six persons headed by Arnold Dubin as Sales Manager.

Defendant Sal Grinding, Inc. ("Sal Grinding") is a New York corporation also having its principal office at 20 Jones Street, New Rochelle, New York. It employs 10 to 15 persons in the business of manufacturing hanger bars and providing custom metal grinding services. Lawrence Rosen, who is Chairman of Mr. Hanger, is President and sole stockholder of Sal Grinding. Shortly after its formation in 1975, Sal Grinding purchased certain machinery and other assets of Sal Metal Products Co., Inc. ("Sal Metal") which had been in the business of manufacturing and selling hanger bars since about 1950. Arnold Dubin, who is Sales Manager of Mr. Hanger, is the only salesman employed by Sal Grinding. His salary is paid two-thirds by Mr. Hanger and one-third by Sal Grinding, although at the present time the salary checks are issued by Mr. Hanger. He has separate business cards for the two employers and conducts correspondence for Sal Grinding on its own stationery.

Some of the same garment manufacturers buy garment hangers from Mr. Hanger and hanger bars from Sal Grinding. At trade shows where Mr. Hanger has a booth, the hanger bars made by Sal Grinding are displayed under a placard bearing the name of Sal Grinding, and the Mr. Hanger personnel manning the booth are authorized to receive orders therefor on behalf of Sal

Grinding, although there was no evidence any such orders were actually received.

In other respects, the two companies are separate and distinct. Sal Grinding keeps its own books, does its own purchasing, pays its own payroll and payroll taxes, ships under its own bills of lading and invoices, issues its own monthly statements to customers, maintains its own bank account and its own accounts with factors.

On at least one occasion, an order for Sal Grinding's hanger bars was erroneously addressed to Mr. Hanger. However, this was an understandable mistake, since Sal Grinding's only salesman, Arnold Dubin, is known in the trade as the sales manager for Mr. Hanger.

#### The patents in suit

The three patents in suit are:

a. United States patent No. 3,306,465 ("the '465 patent") issued February 28, 1967 to Brennan Engineering as assignee of Brennan on an application filed May 12, 1965 for an invention entitled "Wardrobe Hanger Bar with Cap Locking Means;" Brennan Engineering later reassigned the patent to Brennan;

b. United States patent No. 3,613,898 ("the '898 patent") issued October 19, 1971 to Brennan on an application filed January 14, 1970 for an invention entitled "Cap Locking Means for a Wardrobe Hanger Bar;" and

c. United States patent No. 3,519,139 ("the '139 patent") issued July 7, 1970 to Brennan on an application filed March 22, 1968 for an invention entitled "Wardrobe Hanger Bar."

#### The '465 Patent

##### The invention

The '465 patent is directed to means for securing to the top of the hanger bar a hold-down bar or locking cap which prevents the hooks of the garment hangers from coming off the hanger bar during shipment and handling of the garment container.

The hanger bar includes an elongated, horizontal main bar portion made of sheet metal formed into the cross-sectional shape of an inverted U with a generally horizontal upper wall and generally vertical sidewalls depending from either side thereof, and end support members extending perpendicularly across the opposite ends of the main bar, the end support members being formed of sheet metal into the cross-sectional shape of a narrow and deep inverted J with the stem of the J secured to the ends of the main bar and the hook fitting over and gripping the upper edges of two opposed sidewalls of the container, which is made of corrugated paperboard or like material.

The locking cap is stamped from sheet metal into the cross-sectional shape of a wide and shallow inverted U, with a generally horizontal upper wall approximately the same width as the upper wall of the main bar and depending sidewalls lying in approximately the same planes as the sidewalls of the main bar. When garment hangers are in place on the main bar, the lower edges of the sidewalls of the locking cap engage the hooks of the hangers and hold them down against the main bar.

The locking cap is secured to the main bar by means of integral tongues struck out of the upper wall of the locking cap and extending downwardly through openings punched in the upper wall of the main bar and bent over against its under surface.

The significant contribution of the patented invention is asserted to be the provision of a locking means which is less expensive to produce, involving only integral tongues rather than the separately machined threaded studs of the principal prior device, which must be crimped, welded or otherwise secured to the main bar in a separate operation, and simpler to use, employing no separate wing nuts or other loose pieces which are likely to be mislaid or lost.

## Infringement

Only Claim 1 of the '465 patent is sued upon. It is set forth in full in the margin.[1]

Sal Grinding has made and sold three types of hanger bars which are accused of infringement of the patents in suit: the New Yorker, the Philly and the Georgian. The New Yorker and the Philly are "three-piece" hanger bars—that is, the main bar and the end supports are made of separate pieces of sheet metal. The only significant differences between the two are 1) in the New Yorker the ends of the main bar are secured to the *inner* sidewalls of the end supports, while in the Philly they extend through openings in the inner sidewalls of the end supports and are attached to the *outer* sidewalls (thus requiring notches in the upper edges of the sidewalls of the garment container to receive the end portions of the main bar) and 2) in the New Yorker the two sidewalls of each end support are parallel to one another, while in the Philly the inner sidewall is flared inwardly so that its lower edge is spaced from the outer sidewall a greater distance than its upper end.

The Georgian is a one-piece bar in which the main bar and the end supports are stamped from a single piece of sheet metal.

All three models are provided with a locking cap which is similar to that disclosed in the '465 patent except that it is secured to the main bar by tongues struck out from the upper wall of the main bar and extending upwardly through openings in the locking cap.

All of the hanger bars currently sold by Brennan Engineering are also made in this way, because it is much easier to bend the tongues when they project above the locking cap than when they project below the main bar, where access to them is impeded by the hooks of the garment hangers.

The only dispute respecting the infringement of Claim 1 of the '465 patent by any of the three accused hangers concerns the claim recitations 1) that the tongues and openings are "formed between said upper walls of said locking members and main bar, *respectively*," and 2) that the tongues are "offset to *underlie* the edges of the openings." This language clearly applies literally only to a hanger bar in which the tongues are formed on the locking cap and extend downwardly through openings in the main bar, and not the reverse arrangement employed in defendants' accused hanger bars, in which the tongues are formed on the main bar and extend upwardly through openings in the locking cap.

However, this reversal of parts does not affect the locking action. In both constructions, the tongues and openings cooperate to perform the same function (holding down the locking cap) in substantially the same way (by engagement of integral bendable tongues on one element with the edges of openings on the other) to achieve substantially the same result (preventing movement of the hanger hooks off the main bar). The two constructions are full functional equivalents. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

There is nothing in the file history of the application for the '465 patent which would preclude a finding of infringement under the doctrine of equivalents.

Claim 1 of the '465 patent is therefore infringed by all three models of the accused hanger bars, assuming the claim is valid.

1. Claim 1 of the '465 patent reads as follows: "A hanger bar structure for use with a portable moving wardrobe carton and for bearing a plurality of garment hangers therein, comprising:
   an inverted U-shaped main bar having an upper wall and depending side walls for receiving and supporting hangers and having means at opposite ends for mounting the bar on a carton; an inverted U-shaped locking member having an upper wall substantially the same width as said bar upper wall and depending side walls lying in approximately the same plane as said bar side walls, said member lying along and over said bar; and
   means for releasably affixing said member to said bar to prevent disengagement of hangers suspended from said structure and comprising mating struck out tongues and openings formed between said upper walls of said locking member and said main bar, respectively, said tongues being offset to underlie the edges of the openings for clamping the locking member to the main bar."

### Validity

*The prior art*

In attacking the validity of the '465 patent, defendants rely on the following prior United States patents:

a. The 1940 United States patent No. 2,215,695 to Ginsburg and the 1963 United States patent No. 3,112,027 to Field, which disclose hanger bars for garment shipping containers with locking caps secured thereto by threaded studs and wing nuts and threaded thereon. In Ginsburg, the threaded studs are mounted on the locking cap and extend downwardly through openings in the main bar, while in Field the parts are reversed, with the threaded studs being mounted on the main bar and extending upwardly through openings in the locking cap. Field also discloses an alternative construction in which the locking cap is held in place by C–shaped clips which are squarish versions of the pants clips used by bicyclists, and which extend over the ends of the locking cap and around and under the sidewalls of the main bar.

b. The 1964 United States patent No. 3,143,215 to Sitrin, which discloses a hanger bar having tabs struck out from the main bar and extending upwardly to form stops which prevent sliding of the garment hangers along the main bar.

c. The 1934 United States patent No. 1,982,272 to Unger, which discloses a file fastener of the "ACCO" type familiar to every office worker, in which a generally flat, narrow, elongated base member and a cap member are respectively secured at the bottom and top of a stack of sheets of paper by two integral tongues which extend upwardly from the ends of the base member through holes punched near the upper edges of the sheets and through openings in the cap member, and which are bent over against the upper surface of the cap member and held down by lockpieces slidably mounted on the cap member.

Either Ginsburg or Field, in combination with Unger, show every element of the claimed combination. However, it remains to determine whether the replacement of the threaded stud and wing nut locking means of Ginsburg and Field by the bendable tongue locking means of Unger would have been obvious at the time the invention was made to a person having ordinary skill in the art. 35 U.S.C. § 103.

*The presumption of validity*

We begin of course with the statutory presumption that the patent is valid, with defendants having the burden of establishing its invalidity. 35 U.S.C. § 282. Where the prior art relied upon by the defendants in attacking the validity of the patent is no more relevant than that which was cited and considered by the Patent Office, this presumption remains effective. *Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp.*, 372 F.2d 263, 268 (2d Cir. 1967).

Both Field and Sitrin were file wrapper references. Although Unger was not, the Patent Office examiner did cite the Berger United States patent No. 1,968,121 which also discloses bendable prongs for securing together two metallic clamping members. Unger is not significantly more pertinent to the claimed invention than Berger. The presumption of validity therefore remains intact.

Accordingly, as the Court of Appeals stated in the very recent case of *Champion Spark Plug Co. v. Gyromat Corp.*, 603 F.2d 361 (2d Cir. 1979):

"[T]he dispositive question is whether this presumption of validity has been rebutted * * *" (p. 367).

*The test of obviousness*

The Supreme Court has repeatedly cautioned the lower courts to "scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements." *Great A. & P. Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950); see also *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 281, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976). However, as Judge Learned Hand aptly remarked in *Reiner v. I. Leon Co.*, 285 F.2d 501, 503 (2d Cir. 1960), *cert. denied*, 366 U.S. 978, 81 S.Ct. 1918, 6 L.Ed.2d 1268 (1961).

"It is idle to say that combinations of old elements cannot be inventions; substantially every invention is for such a 'combination': that is to say, it consists of former elements in a new assemblage."

And, in its most recent decision in a patent case, the Court of Appeals similarly stated:

"Most, if not all, inventions involve a combination of old or known elements. [Citation] If the inventions are new, useful, and nonobvious, they are patentable. If the level of skill of a person of ordinary skill in the pertinent art is such that the differences between the subject matter sought to be patented and the prior art would not have been obvious to that person, the test for nonobviousness is met." *Champion Spark Plug Co. v. Gyromat Corp., supra,* at p. 372.

The procedure for resolving the issue of obviousness is prescribed by *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966):

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."

We have already discussed the principal "background" considerations—the scope and content of the prior art and the differences between the prior art and the claim in suit. There was no evidence of the level of ordinary skill in the art other than as reflected in the prior art itself.

"Against this background," *Graham v. John Deere, supra,* directs us now to determine the obviousness *vel non* of the claimed subject matter, permissibly utilizing such "secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc." as "indicia of obviousness or nonobviousness."

Later decisions of the Supreme Court have suggested that the issue of obviousness may be determined *before* reaching the "secondary considerations." For example, in *Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc.,* 396 U.S. 57, 61, 90 S.Ct. 305, 308, 24 L.Ed.2d 258 (1969), the Court stated:

"It is, however, fervently argued that the combination filled a long felt want and has enjoyed commercial success. But those matters 'without invention will not make patentability'. *A. & P. Tea Co. v. Supermarket Corp.,* 340 U.S. 147, 153 [71 S.Ct. 127]."

And in a dissenting opinion to the denial of certiorari in *Roanwell Corp. v. Plantronics, Inc.,* 429 U.S. 1004, 1008–9, 97 S.Ct. 538, 541, 50 L.Ed.2d 617 (1976), Justice White, joined by Justice Brennan, wrote:

"Although the Court has held that need, prior failure, and commercial success may, 'in a close case, tip the scales in favor of patentability,' *Goodyear Tire & Rubber Co. v. Ray–O–Vac Co.,* 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721 (1944), it has consistently and repeatedly rejected the claim that the standard of invention or nonobviousness can be satisfied solely by these 'objective' criteria. *Anderson's-Black Rock, supra,* 396 U.S. at 61, 90 S.Ct. 305; *Great A. & P. Tea Co.,* 340 U.S. at 153, 71 S.Ct. 127; *Jungersen v. Ostby & Barton Co.,* 335 U.S. 560, 567, 69 S.Ct. 269, 93 L.Ed. 235 (1949). In *Graham v. John Deere Co., supra,* we reaffirmed and refined the basic test of patentability and firmly established the role of 'secondary' factors in the procedure for determining when the standard of nonobviousness is met:

\* \* \* \* \* \*

"Applying this test in *Graham,* we expressly rejected a claim that the secondary considerations could fill the void left by 'exceedingly small and quite non-tech-

nical mechanical differences in a device which was old in the art'. *Id.*, [338 U.S.] at 35–36, 86 S.Ct. 684."

This led the Court of Appeals for the Second Circuit in *Digitronics Corp. v. New York Racing Assn., Inc.*, 553 F.2d 740, 748–49, 193 U.S.P.Q. 577, 584 (2d Cir.), *cert. denied*, 434 U.S. 860, 98 S.Ct. 187, 54 L.Ed.2d 133 (1977) to state even more specifically:

> "Any theory that 'secondary' considerations must be given weight before a determination of obviousness can be made was laid to rest in *Sakraida v. Ag Pro, Inc., supra*, 425 U.S. at 282–83, 96 S.Ct. 1537. . . .
>
> \*     \*     \*     \*     \*     \*
>
> "Only in a close case, in which application of the subjective criteria of nonobviousness in 35 U.S.C. § 103 does not produce a firm conclusion, can these objective or secondary considerations be used to 'tip the scales in favor of patentability'. *Roanwell Corp. v. Plantronics, Inc., supra*, 429 U.S. at 1008, 97 S.Ct. at 541, [192 U.S.P.Q. at 66] (White, J., joined by Brennan, J., dissenting from denial of certiorari), *quoting Goodyear Tire & Rubber Co. v. Ray–O–Vac Co.*, 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721 [60 U.S.P.Q. 386, 388] (1944). Because we hold that the claims made here are clearly obvious, we need not examine secondary considerations."

If the issue of obviousness has actually been resolved before reaching the "secondary considerations," it must have been decided on the basis of the "background" factors alone—the differences between the claimed invention and the prior art and the level of ordinary skill in the art—in other words, it must have been decided on the basis of the Court's intuitive appraisal of the level of ingenuity involved in making the invention and its estimate whether that level is within the reach of one of average competence.

One of the difficulties inherent in this approach is that it is unavoidably subjective. What one judge sees as a rare and fortuitous stroke of creative inspiration, another may view as the predictable product of the routineer, particularly if the invention is an apparently minor improvement in a device having little evident impact on the general public. Another difficulty is that it is humanly possible to escape the distorting effect of hindsight—to put the invention entirely out of mind and view the problem as it actually existed before the solution was known.

The Supreme Court itself has repeatedly commented on these matters. For example, in the oft-quoted early decision in *Diamond Rubber Co. v. Consolidated Rubber Tire Co.*, 220 U.S. 428, 434–35, 31 S.Ct. 444, 447, 55 L.Ed. 527 (1911), the Court stated:

> "Many things, and the patent law abounds in illustrations, seem obvious after they have been done, and, 'in the light of the accomplished result,' it is often a matter of wonder how they so long 'eluded the search of the discoverer and set at defiance the speculations of inventive genius.' [Citation] Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as not having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not."

See also *Goodyear Tire & Rubber Co. v. Ray–O–Vac Co.*, 321 U.S. 275, 279, 64 S.Ct. 593 (1944).

Judge Learned Hand wrote an even more familiar and compelling statement to the same effect in *Reiner v. I. Leon Co., supra*, 285 F.2d at 503–4:

> "The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general

history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not, 'obvious' is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it. There are indeed some sign posts: e. g. how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant?"

And in *Norman v. Lawrence*, 285 F.2d 505, 506 (2d Cir. 1960), decided the same day, he added:

"It is true that courts have again and again evinced repugnance to recognizing as patentable a trivial readjustment of existing elements into a new combination, apparently insisting that monopolies should be limited to new assemblages of old elements that are important and imposing. That disposition will no doubt continue; it is hard to attach value to a trifling modification of a gadget that has arisen on the surface of a stream of novelties because it has found immediate favor. We can only reply that, while the standard remains what it is, we can see no escape from measuring invention in cases where all the elements of the new combination had been long available, (1) by whether the need had long existed and been desired, and (2) whether, when it was eventually contrived, it was widely exploited as a substitute for what had gone before."

The Supreme Court in *Graham v. John Deere, supra*, similarly recognized the deluding influence of hindsight in determining obviousness and the value of the objective factors referred to by Judge Learned Hand:

"These legal inferences or subtests do focus attention on economic and motivational rather than technical issues and are, therefore, more susceptible of judicial treatment than are the highly technical facts often present in patent litigation. See Judge Learned Hand in *Reiner*

*v. I. Leon Co.*, 285 F.2d 501, 504 (2 Cir. 1960). See also Note, Subtests of 'Nonobviousness': A Nontechnical Approach to Patent Validity, 112 U.Pa.L.Rev. 1169 (1964). Such inquiries may lend a helping hand to the judiciary which, as Mr. Justice Frankfurter observed, is most ill-fitted to discharge the technological duties cast upon it by patent legislation. *Marconi Wireless Co. v. United States*, 320 U.S. 1, 60, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943). They may also serve to 'guard against slipping into use of hindsight,' *Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co.*, 332 F.2d 406, 412 (1964), and to resist the temptation to read into the prior art the teachings of the invention in issue." 383 U.S. at 35–36, 86 S.Ct. at 703.

The Court of Appeals in *Digitronics Corp., supra*, 553 F.2d at 748, acknowledged the force of Judge Hand's logic, but correctly noted that it had effectively been repudiated by the latest decisions of the Supreme Court:

"Despite the persuasive advocacy of Judge Learned Hand, *Reiner v. I. Leon Co.*, 285 F.2d 501, [128 U.S.P.Q. 25] (2d Cir. 1960); *Lyon v. Bausch & Lomb Optical Co.*, 224 F.2d 530, [106 U.S.P.Q. 1] (2d Cir. 1955), this view does not represent current law."

Despite an abiding conviction that Judge Learned Hand and the earlier decisions of the Supreme Court were correct, this Court has no choice but to follow the latest pronouncements of the Supreme Court and of the Court of Appeals for the Second Circuit.

However, this does not end the inquiry or eliminate the difficulties adverted to above.

The invention is manifestly only a relatively modest improvement in a device of such specialized application that the average person is probably not even aware of its existence. It is indeed tempting simply to announce that the obviousness of the invention is clear and that it is therefore unnecessary to proceed to the "secondary considerations."

But in this case, where the *only* evidence of obviousness is a group of prior patents,

all of which were either considered by the Patent Office or are no more relevant than those which were, such an approach by the Court would amount to nothing more than the substitution of its judgment of obviousness for that of the Patent Office examiner.

This Court would not shrink from such a substitution if it had a firm conviction of the obviousness of the invention, but it does not. In the circumstances, the Court cannot resolve the issue of obviousness without turning to the evidence bearing on the "secondary considerations."

That evidence includes the following:

In 1965, when Brennan Engineering introduced its hanger bars, as a newcomer to the garment industry, its principal competitor was H. Field & Son, which was selling hanger bars of the type shown in the aforementioned Field United States patent No. 3,112,027, in which the locking cap is secured by wing nuts engaging threaded studs projecting upwardly from the main bar. When the patented Brennan bar was introduced, a number of Field's customers switched to it and some of Field's patent licensees applied to Brennan Engineering for licenses.

Brennan Engineering's annual sales of hanger bars increased from 144,000 units in 1965 to 388,000 in 1968.

The Brennan construction was copied by others, including Industrial Hardware & Tool Co., and perhaps Sal Metal as well. The former company accepted a consent decree enjoining it from further infringement.

There is no question that in the respects of economy of manufacture and ease of use, the bendable tongues of the Brennan hanger bar are markedly superior to the threaded studs and wing nuts of the principal competitive device. And if there were any such doubt, their relative performances in the market would appear to have settled the issue.

Although the expedient employed by Brennan is simple in the extreme, the fact that the competition continued for years to sell a device with known shortcomings strongly suggests that the expedient was not obvious *before* Brennan led the way.

Although it was old and well known to secure together two clamping members by the use of bendable tongues, such means had not been used before in an art analogous to hanger bars. The ACCO file fastener, as shown by the Unger patent, is constructed of very thin-gauge metal—so thin, indeed that the tongues, after being bent over, are held down by lock pieces which are slid along the cap member into position over the bent-down tongues. The fastener is not subjected to any forces comparable in magnitude to those to which a garment hanger bar is subjected during shipment and handling.

It was not readily foreseeable that the same expedient which proved so successful in the file fastener art could be used in the hanger bar art—that sheet metal sufficiently thick and rigid to form a bar for supporting a container full of garments on hangers could be readily bent by the fingers to serve as an interlock which, without being held down by a separate lockpiece, would keep the locking cap in position on the hooks of the hangers despite the substantial stresses imposed upon it as the container is subjected to the distorting forces which might foreseeably be encountered in shipment and handling.

What "sign posts" there are in this case all point in the direction of non-obviousness.

There remains to consider whether the invention defined by Claim 1 of the '465 patent lacks the quality of "synergism," as required by *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282, 96 S.Ct. 1532 (1976); and *Anderson's-Black Rock, Inc., supra,* 396 U.S. at 61, 90 S.Ct. 305.

These decisions have caused massive consternation among members of the patent bar, not only because they create, by judicial fiat, an entirely new and different prerequisite to patentability over and above those established by the patent statutes, but also because the term "synergism" has no generally understood meaning or application outside the fields of chemistry and

pharmacology. In the mechanical and electronic fields, for example, the combination of elements always produces a result which is precisely equal to the sum of their respective contributions; "synergism," in the conventional sense, never exists.

With a masterful demonstration of the lack of either statutory or logical basis for a requirement of synergism, the Court of Appeals for the Seventh Circuit in *Republic Industries, Inc. v. Schlage Lock Co.*, 592 F.2d 963, 967–972 (7th Cir. 1979), courageously declined to impose such a requirement for patentability. Even more recently, the Court of Appeals for the Tenth Circuit, in *Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc.*, 607 F.2d 885 (10th Cir. 1979) followed suit, noting that the guidelines established in *Graham v. John Deere, supra* "do not require that, for a combination of known elements to be nonobvious, the result achieved by the combination must be synergistic." Interestingly, as authority for that proposition, Judge Miller of the United States Court of Customs and Patent Appeals, sitting by designation, relied on his earlier opinion for the Second Circuit Court of Appeals in *Champion Spark Plug Co. v. Gyromat Corp., supra* at p. 372, although the "synergism" requirement was not specifically discussed there, but merely omitted from a listing of the requisites of patentability.

Left with any choice, this Court would enthusiastically join the Courts of Appeals for the Seventh and Tenth Circuits in expressly repudiating the synergism requirement. Absent such choice, the Court must nevertheless attempt to construe the term "synergism" in such a way as to give it logical meaning within the context of the field of mechanics. As thus construed, the Court finds that the "synergism" requirement is met by the invention described in Claim 1 of the '465 patent. The several elements of the claimed combination cooperate to produce a highly desirable new result not theretofore obvious: a hanger bar which is not only cheaper to make but easier to use. This seems as close to "synergism" as anyone will ever get with a mechanical device.

The Court concludes that defendants have failed to overcome the presumption of validity of Claim 1 of the '465 patent and that the claim is valid.

*Alleged prior manufacture and sale by Sal Metal*

■ Defendants attempted to prove that the '465 and '138 patents are invalid because Sal Metal made and sold hanger bars incorporating the claimed inventions long before the filing dates of the applications for these patents.

This evidence, consisting entirely of oral testimony based on the unaided recollection of two witnesses, unsupported by any documentary records, and in many respects contradictory, was wholly unconvincing.

This defense was obviously an afterthought. In interrogatories which they answered six months before trial, defendants were asked to identify any witnesses who would be relied on to prove prior use by Sal Grinding or Sal Metal; their answers listed no such witnesses. In their Notice of Prior Art under 35 U.S.C. § 282, served one month before trial, defendants listed one such witness, Irene Swiderski. Then, only one week before trial, they served an amended notice listing a second witness, William Dempsey. Although Dempsey's testimony could have been excluded for non-compliance with Section 282, the Court, in the exercise of its discretion, permitted it.

However, Dempsey's testimony did not carry conviction, particularly when considered in light of the entire record.

Swiderski's testimony was equally unconvincing. She repeatedly contradicted herself respecting the dates of events on which she relied in fixing the periods when certain types of hanger bars were made by Sal Metal.

The evidence fell far short of the clear and convincing proof required for establishing prior manufacture or sale. *Barbed Wire Patent Case*, 143 U.S. 275, 284–285, 12 S.Ct. 443, 36 L.Ed. 154 (1892); *Rooted Hair, Inc. v. Ideal Toy Corp.*, 329 F.2d 761, 765 (2d

Cir.), *cert. denied*, 379 U.S. 831, 85 S.Ct. 63, 13 L.Ed.2d 40 (1964), I Deller's Walker on Patents (2d ed. 1964), §§ 81, 82.

### The '898 Patent

*The invention*

■ The '898 patent covers an alleged improvement in the shape of the locking cap.

The cap is stamped into what is referred to in the patent claims and in the testimony as a "W"-shape, but its cross-sectional shape may be more accurately described as including a relatively wide, flat central portion with a small U-shaped channel or ridge at each side.

The advantage asserted for this shape is that it permits the locking cap, simply by inverting it, to be used with both round-hooked and square-hooked garment hangers. With a round-hooked hanger, the locking cap is positioned so that the U-shaped channels open upwardly and the rounded projections on the bottoms of the channels engage opposite sides of the hooks while the flat central portion of the cap engages the tops of the hooks.

When used with square-hooked hangers, the cap is inverted so that the U-shaped channels open downwardly. The flat central portion of the cap lies flush against the flat portion of the hooks, while the depending edges of the channels—which project slightly below the plane of the lower surface of the flat central portion—engage the

outer surfaces of the curved corners of the hooks.

### Validity

*The claims in suit*

Of the ten claims of the '898 patent, all but claims 4 and 10 are alleged to be infringed by all three aforementioned models of Sal Grinding's hanger bars.

The only two independent claims in the patent are Claims 1 and 6; Claims 2 through 5 are dependent on Claim 1 and Claims 7 through 10 are dependent on Claim 6.

Claim 1 is set forth in full in the margin.[2]

The novelty of the claimed invention is confined to the last portion which reads:

"the center walls and the peripheral walls of the channellike portions of the W-shaped locking member being dimensioned so as to each contact hangers on the carrier member at spaced locations with the peripheral walls being adapted to contact the hangers within planes lying inwardly of the outer surfaces of the carrier member sidewalls."

Claim 6 is substantially identical with Claim 1 except for the terminal portion which reads:

"the center walls and the channellike portions of the U-shaped locking member being dimensioned so as to each contact hangers on the carrier member at spaced locations with the channellike portion be-

2. Claim 1 of the '898 patent reads as follows:
"A hanger bar structure for bearing a plurality of garment hangers comprising:
An elongated generally inverted U-shaped carrier member having a center wall of a width adapted to engage hangers and sidewalls on opposite sides thereof;
an elongated generally W-shaped locking member having a center wall of somewhat lesser width than said carrier member center wall and spaced side channellike portions disposed on opposite sides having peripheral walls spaced from said locking member center wall and lying in approximately the same plane as said carrier member sidewalls, said locking member being adapted to lie over said carrier member and providing a plurality of support areas for hangers on said carrier member and

means for releasably affixing said locking member to said carrier member to prevent disengagement of the hangers on said carrier member, comprising mating struckout tongues and openings formed between said center wall of said locking member and said carrier member, said tongues being offset to underlie the edges of the opening for affixing said locking member to said carrier member, the center walls and the peripheral walls of the channellike portions of the W-shaped locking member being dimensioned so as to each contact hangers on the carrier member at spaced locations with the peripheral walls being adapted to contact the hangers within planes lying inwardly of [t]he outer surfaces of the carrier member sidewall."

ing adapted to contact the hangers within planes lying inwardly of the outer surfaces of the carrier member sidewall when said locking member is disposed in a first position with the channel portions engaging the adjacent portion of a curved hook and with the peripheral walls being adapted to contact the hangers within planes lying outwardly of the outer surfaces of the carrier member sidewall when said locking member is disposed in an inverted second position with the peripheral walls engaging the adjoining portion of a flat hook."

The quoted portions of both claims were added at the suggestion of the Patent Office examiner after all the claims had been rejected in view of the prior art. Unfortunately, the patent specification does not even mention the relationship described in these portions of the claims, much less disclose their functional significance.

The trial record is likewise devoid of any suggestion of any plausible advantage of contacting a round hanger hook at points lying inwardly of the outer surfaces of the sidewalls of the main bar, or of contacting a square hanger hook at points lying outwardly of these surfaces, and this Court can conceive no such advantage.

Because of the stiffness of the hooks, firmly engaging them at any point above the upper surface of the main bar should effectively hold them down against the main bar. Engaging them at any two points spaced substantial distances at opposite sides of the center line of the main bar should increase the reliability of the clamping action, but this is true whether the points of contact are either slightly inside or slightly outside the outer surfaces of the sidewalls of the main bar.

Moreover, Claim 1 is inconsistent with the patent drawings and with Claim 6. The "peripheral walls of the channellike portions of the W-shaped locking member" as referred to in Claim 1 are identified in the specification and drawings by the reference numeral 15c. They are shown in the drawing to be the outer sidewalls of the channels; the specification confirms this by de-

scribing them as "spaced from the center wall 15a [of the locking member] and lying in approximately the same plane as the sidewalls 11b, 11b of the carrier member 11 [the main bar]."

Although Claim 1 describes these peripheral walls as "being adapted to contact the hangers within planes lying inwardly of the outer surfaces of the carrier member sidewall," the drawings clearly show, to the contrary, that the peripheral walls contact the hanger hooks at points lying *outwardly* of the planes of the outer surfaces of the sidewalls of the main bar.

Claim 1 clearly does not satisfy the requirement of "particularly pointing out and distinctly claiming" the alleged invention, as established by 35 U.S.C. § 112, and would probably be invalid for this reason if no other. *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 232–37, 63 S.Ct. 165, 87 L.Ed. 232 (1942).

Claim 6 does not share this particular deficiency, but both it and Claim 1 suffer the even more serious defect that they describe a relationship which is not disclosed in the specification and which has no disclosed or perceivable utility.

Both claims are thus invalid because the specification fails to describe the claimed invention in "full, clear, concise and exact terms" as further required by 35 U.S.C. § 112. *Carter-Wallace, Inc. v. Otte*, 474 F.2d 529, 547–48 (2d Cir. 1972), *cert. denied*, 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973).

The claims are invalid for the still further reason that the relationship they describe is not demonstrably "useful" as required by 35 U.S.C. § 101. I Deller's Walker on Patents (2d ed. 1964), § 85.

■ There is nothing wrong with a Patent Office examiner's suggestion of claims for inclusion in a patent application pending before him. But when he suggests claims describing a relationship which is not disclosed in the specification or drawings or is even at variance with their disclosure, and which affords no disclosed or perceivable functional advantage, the claim is clearly

invalid, not only on the aforementioned grounds of non-compliance with Sections 112 and 101, but probably for the additional reason that the applicant "did not himself invent the subject matter sought to be patented," as required by 35 U.S.C. § 102(f).

In the present case, the examiner's suggestion was apparently seized upon by the applicant as his last hope of avoiding total rejection and abandonment of the application and salvaging some remnant of coverage. The straw which he grasped proved a frail one indeed.

Since all of the dependent claims of the '898 patent incorporate by reference the same features of Claims 1 and 6 which render them invalid, they are likewise invalid.

### Infringement

Claim 1 and the claims dependent upon it would not be infringed even if valid, because the relationship described is not achieved in the use of the accused ·Sal Grinding hanger bars.

Claims 6, 7 and 9 would be infringed if valid.

Claim 8 would not be infringed even if valid, because it calls for a three-point contact between the locking cap and (round-hooked) garment hangers. This feature not only affords no apparent advantage over two-point contact but it would be achieved only sporadically and fortuitously because of the lack of uniformity of the outside diameters of the hooks of round-hooked garment hangers, even those of identical type and source.

### The '139 Patent

#### The invention

■ The '139 patent covers an improvement in the end support members designed to strengthen them to increase their resistance to opening up and releasing their grip on the upper edges of the sidewalls of the container when the container is handled or dropped so as to tend to rack it out of its normal rectangular shape.

The improvement consists of embossed indentations or "notches" extending across the end portions of the upper or "base" wall of the end supports and embossed rib-like projections or "ridges" extending downwardly along the sidewalls of the end supports, the projections being aligned with the indentations on the upper wall and merging with them at the upper corners of the end supports.

The indentations are asserted to afford the additional advantage of digging into the upper edges of the sidewalls of the garment container to resist sliding of the hanger bar along the sidewalls, with resulting shifting and crushing of the garments.

### Infringement

Of the eleven claims in the '139 patent, all except Claims 8 and 9 are in suit. Of the claims in suit, only Claims 1 and 2 are independent claims. All of the other claims in suit are dependent, either directly or indirectly on Claim 2. Claims 1 and 2 are reproduced in full in the margin.[3]

3. Claims 1 and 2 of the '139 patent read as follows:

"1. In a wardrobe hanger bar, an elongated hanger bar for supporting hangers therefrom, having a central axis and an end support fastened to each respective end of said hanger bar for supporting said hanger bar on the walls of a corrugated cardboard wardrobe carton, each said end support comprising a sheet-form member shaped in an inverted U-shaped configuration and having a base wall and two side walls depending therefrom in spaced parallel relation, said base wall of said end support having a pair of spaced transverse notches dispersed on opposite sides of the central axis of said cross bar, said transverse notches being embossed in said base wall to extend transversely completely across said base wall and downwardly into the space between said two side walls thereby to deformably engage the adjoining upper edges of the carton and stabilize the support of the bar thereon, each said side wall having an outwardly extending embossment forming a flanking ridge in alignment with said notches to improve the strength-to-weight ratio of the end supports."

"2. In a hanger bar structure adapted to be used in a wardrobe carton for bearing hangers thereon, an elongated channel shaped bar member having a top with two sides depending therefrom, each of said two sides having a lower portion with a free edge, an end support attached to each opposite end of

Sal Grinding's New Yorker hanger bar infringes Claim 1 of the '139 patent, assuming the claim is valid. Claim 2, and all of the other claims in suit, which are dependent on it, are not literally readable on the New Yorker bar because Claim 2 recites that the upper wall of each end support is "planar"—*i. e.*, flat—whereas in the New Yorker this wall has a formed depression extending along its full length, the apparent purpose of which is to stiffen the end support against deformation in a vertical plane.

However, the depressed upper wall of the New Yorker bar is the functional equivalent of the planar upper wall of Claim 2. There is nothing in the file history of the application for the '139 patent which would prevent a finding of infringement of Claim 2 under the doctrine of equivalents. Claim 1 of the application as filed contained this limitation, and it was preserved in each of the successor claims which replaced it. No significance was attached to it during the prosecution. The Court accordingly finds that Claim 2, assuming it is valid, is infringed by the New Yorker bar.

The dependent Claim 3 adds only the requirement of "at least a pair of said transverse notches" and specifies that the "additional reinforcing means" called for in Claim 2 includes outwardly bowed ridges flanking the transverse notches. The New Yorker clearly has these features and also infringes Claim 3, assuming its validity.

Claim 4, and Claims 5, 6 and 7, which are dependent upon it, are not infringed because Claim 4 requires a "guide notch" in the outer side edge of the upper wall, which the New Yorker does not have.

Claim 10, if valid, if infringed by the New Yorker because it adds to Claim 2 only the recitation that the lower edges of the main bar are "curled towards each other and lying in substantially the same horizontal plane," a relationship present in the New Yorker. Claim 11 is likewise infringed because it adds only the locking cap held in place by bendable tongues struck out of the main bar and extending upwardly through holes in the locking cap.

Claim 1 is not literally readable on Sal Grinding's Philly style hanger bars because the claim recites that the sidewalls of the end supports depend from the upper wall "in spaced *parallel* relation," whereas the sidewalls of the end supports of the Philly bar are not parallel but divergent—the inner sidewall being inclined inwardly while the outer sidewall is substantially vertical.

However, there is no apparent functional advantage for this divergence of the sidewalls. Just the contrary, it seems to have been a design objective in the development of most of the hanger bars involved herein to keep the sidewalls of the end supports from being flared away from the sidewalls of the container to maintain firm and rigid engagement between them. This, indeed, was the stated purpose of the indentations and ridges of the '139 patent.

In the Philly bar, the outward flaring of the *outer* sidewalls, at least, was not a problem because these sidewalls are connected directly to the ends of the main bar, which extend through openings in the inner sidewalls. And the inward flaring of the inner sidewalls was obviously not considered a problem, because they were intentionally made that way.

▮ In any event, the Court could not interpret Claim 1 so as to disregard the

said bar member, each said end support being of an inverted U-shaped cross-section having an upper planar portion bounded by inner and outer opposite side edges and opposite end edges, an inner side depending from the inner side edge, said inner side being attached at a central portion thereof to said elongated channel shaped bar member, an outer side depending from the outer side edge, said upper planar portion of said end supports having at least one transverse notch therein extending from said inner side edge to said outer side edge, an additional reinforcing means integrally formed in said inner side and said outer side at the respective ends of said transverse notch, said transverse notch creating a tooth-like structure in the underside of the upper planar portion of the U-shaped member that is adapted to dig into the edge of the wardrobe carton to prevent movement of the hanger bar therealong."

requirement that the sidewalls are parallel, because of a file wrapper estoppel. None of the claims as originally filed contained this limitation. After all the claims had been rejected as unpatentable over the prior art, the claims were rewritten to introduce this limitation, among others, and the claims were allowed. Brennan is therefore estopped to contend that Claim 1 should be accorded the scope it would have if the limitation had not been added. *Capri Jewelry, Inc. v. Hattie Carnegie Jewelry Enterprises, Ltd.*, 539 F.2d 846, 851–52 (2d Cir. 1976).

Claim 2, and all of the other claims in suit, which are dependent on it, are not infringed by the Philly bar because they require that the *inner* sidewall be attached at a central portion thereof to the main bar, whereas, as previously mentioned, in the Philly bar the ends of the main bar are attached to the *outer* sidewalls. The difference is functionally significant, not only because this greatly strengthens the outer sidewalls, but also because the ends of the main bar are received in notches in the upper edges of the container sidewalls, which prevents sliding of the hanger bar along the container sidewalls and thus renders wholly superfluous the much less positive effect of the slight indentations in upper wall in resisting such movement.

The Court thus concludes that none of the claims of the '139 patent is infringed by the Philly bar.

The Georgian bar has neither indentations nor ridges in its end supports and thus clearly does not infringe any of the claims of the '139 patent.

### Validity

#### The prior art

The principal prior patent relied on by defendants in attacking the validity of the '139 patent is clearly the 1944 Brown et al. United States patent No. 2,357,309, which discloses a hanger bar for a garment container in which the end supports are reinforced by embossed projections or "ribs" extending across the upper wall of each end support and downwardly along both sidewalls. The Brown et al. patent describes the function of these ribs as being to "serve to add strength to the carrier support and to prevent undesirable distortion thereof under the various stresses encountered in service."

There is no apparent reason why the ribs of Brown et al. will not add at least as much strength to the end supports as the Brennan '139 patent's combination of notches in the upper wall merging with ridges in the sidewalls. Although the ribs of Brown et al. would not perform the additional function of digging into the upper edge of the sidewall of the container to resist sliding of the support member along the sidewall, this concept was old and well known. It is shown, for example, by the aforementioned 1967 Field et al. United States patent No. 3,298,503, which discloses prongs 34 struck from the upper wall which "cut into the double thickness sidewall top edges to prevent * * * shifting along the sidewall top edges," and by the 1969 Crane United States patent No. 3,421,614 which discloses ribs 68 which "bite into the top of the reinforced sidewalls" so that the hanger bar will "not slip along [the] sidewalls once installed."

Neither the Field et al. '503 patent nor the Crane et al. '614 patent were cited during prosecution of the application for the '139 patent. However, the examiner did cite Brennan's own prior patents Nos. 3,306,465 and 3,197,033 as showing notches in the upper wall of the support member. The notches 23 of the Brennan '033 patent are disclosed as functioning only (1) to prevent the sidewalls of the end supports from "turning"—what that means is unclear—and (2) to add "such additional strength to the end channels that it is possible to use a thinner gauge metal * * *." There is no suggestion in the '033 patent that the notches would also resist sliding of the end supports along the sidewalls of the container.

On the other hand, the Brennan '465 patent (one of the patents here in suit) discloses indentation at the *ends* of the upper walls of the end supports "to prevent hori-

zontal movement or sliding of the bar structure 14 along the walls 12, 12'." The indentations do no extend "completely across [the] base, [i. e., upper] wall" as required by Claim 1 nor "from [the] inner side edge to [the] outer side edge of [the] base wall" as required by Claim 2. Nor are they aligned with the ridges on the sidewalls of the end support as further required by Claim 1.

However, the prongs of Field, et al. '503 and Crane et al. '614 fail to satisfy the language of the claims in these same respects. Thus the prior art relied on by defendants here is no more relevant than that cited by the Patent Office. The presumption of validity therefore remains intact.

*The differences between the claimed invention and the prior art*

As already noted, the prior art teaches the use of formed reinforcing ribs extending continuously across the upper wall and down the sidewalls of the end supports, and also teaches the use of indentations in the upper wall which dig into the upper edges of the container sidewalls to resist sliding of the hanger bar therealong. However, there was no prior device in which indentations in the upper walls of the end supports merging with ridges extending down the sidewalls performed both functions of strengthening the end supports against flaring thereof and resisting sliding of the hanger bar along the container sidewalls.

*Obviousness of the invention*

No significant advantage in combining both functions in a single element has been suggested, and none appears.

The provision in the production dies of surfaces for forming separate ribs for strengthening and indentations for resisting sliding would involve only negligible additional cost, if any. And the effectiveness of separate elements in both strengthening and in resisting sliding would be at least as great as that of a single element performing both functions.

Thus it seems impossible to find, in Brennan's combination of these old and well known functions in a single element, the utility which 35 U.S.C. § 101 requires for patentability.

Nor does the combination appear to involve anything beyond the most routine skill.

There are no clear "sign posts" pointing in the direction of non-obviousness. There was no long-felt need, no unsuccessful efforts to fill it, not even any commercial success attributable to the invention of the '139 patent. The only "secondary consideration" which might tend to show non-obviousness is the apparent copying by Sal Grinding. But in view of the utter lack of significance in combining in a single element the two functions of reinforcement and resistance to sliding, such copying proves nothing other than Sal Grinding's remarkable laziness and lack of independent thought.

All of the Claims of the '139 patent in suit are invalid for lack of utility and for obviousness.

*Alleged Infringement by Mr. Hanger*

█ Plaintiffs urge that the patents in suit have been infringed not only by Sal Grinding but also by Mr. Hanger, because of its assistance to Sal Grinding in the sales of the latter's hanger bars.

35 U.S.C. § 271(b) provides:

"Whoever actively induces infringement of a patent shall be liable as an infringer."

If Mr. Hanger personnel had actually written orders for the Sal Grinding hanger bars, there would appear to be no doubt this would amount to actively inducing infringement of those claims of plaintiff's patent which are infringed. However, as previously noted, the record does not reflect that any such orders were actually written by Mr. Hanger personnel. And there can be no active inducement of infringement unless infringement actually results. *Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., supra* at 270. Nor would the mere display of the hanger bars constitute an infringing "use." *Knapp-Monarch Co. v. Casco Products Corp.,* 342 F.2d 622 (7th Cir. 1965), cited with approval in *Ling-Temco-Vought, supra.*

The Court concludes that infringement by Mr. Hanger has not been established.

### Attorney's Fees

■ Plaintiffs argues that they are entitled to an award of attorney's fees against defendants because of defendants' unsuccessful attempt to prove prior use and sale by Sal Metal of hanger bars incorporating the features covered by the '465 and '139 patents and because of Mr. Hanger's "bad faith" (albeit successful) attempt to avoid a finding that it had actively induced infringement.

35 U.S.C. § 285 provides:

"The court is exceptional cases may award reasonable attorney fees to the prevailing party."

This is not a case calling for such an award. Plaintiffs were successful as to only one claim of one of the three patents in suit. The other two patents claim features of trivial, if any, commercial significance, at least one of which was not even disclosed in the patent specification, and apparently was the brainchild not of Brennan but of the Patent Office examiner.

Neither costs nor attorney's fees are awarded in favor of either party.

### Summary

Claim 1 of the '465 patent is valid and has been infringed by Sal Grinding's New Yorker, Philly and Georgian hanger bars.

All of the claims of the '898 patent are invalid. Claims 6, 7 and 9, if valid, would be infringed by all three of Sal Grinding's accused hanger bars; none of the remaining claims, even if valid, would be infringed by any of the accused hanger bars.

All of the claims of the '139 patent are invalid. If valid, Claims 1, 2, 3, 10 and 11 would be infringed by the New Yorker hanger bar; the remaining claims would not be. None of the claims of the '139 patent would be infringed by the Philly or by the Georgian hanger bars, even if valid.

There has been no infringement by Mr. Hanger and the action is dismissed as to it.